COMMONWEALTH of Pennsylvania,
Appellee

v.

Harry GREEN, Appellant.

Superior Court of Pennsylvania.

Submitted May 13, 2013.
Filed Sept. 4, 2013.

Suzanne M. Swan, Public Defender, Pittsburgh, for appellant.

Michael W. Streily, Deputy District Attorney, Pittsburgh, for Commonwealth, appellee.

BEFORE: BENDER, J., LAZARUS, J., and STRASSBURGER, J.*

OPINION BY BENDER, J.

Appellant, Harry Green, appeals from the judgment of sentence of an aggregate

* Retired Senior Judge assigned to the Superior Court.

term of 21 ½—43 years' incarceration following his conviction for third-degree murder and a violation of the Uniform Firearms Act. Appellant claims the trial court erred in its resolution of several evidentiary issues. After careful review, we affirm.

The events that gave rise to Appellant's trial for murder were recounted by the trial court as follows:

On the afternoon of August 9, 2010, [the Victim] was shot by her boyfriend, [Appellant], in her apartment on Deraud Street in the Hill District section of Pittsburgh. [The Victim] died of a gunshot wound to the head, with a single bullet having entered her head below her right eye. The bullet was recovered [from the] inside [of her] skull. Mr. Terrence Lee, a friend of the [V]ictim and acquaintance of [Appellant], was at the apartment at the time of the shooting and identified [Appellant] as the shooter.[2]

_____

[2] Terrence Lee's trial testimony recanted his earlier statements to police. However, this court found the earlier statements to the police to be credible and compelling, as well as consistent with other evidence in the case. Mr. Lee had explained to the [V]ictim's mother that he was anxious about being threatened for his statements to police.

According to the testimony at trial, in the time leading up to the shooting, [Appellant] and [the Victim] had been arguing. [The Victim] had expressed, to a friend and family members, her intentions to break off her relationship with [Appellant]. She was discussing with her friends and family her plans to move from the Hill District to the East Hills. The move was going to be financed by an old boyfriend. Several hours prior to the shooting, [Appellant] overheard one such heated discussion between [the Victim] and her sister, Kahlia. Within minutes of overhearing that conversation, [Appellant] and [the Victim] had an argument, during which [Appellant] took [the Victim]'s cell phone. As [Appellant] left [the Victim]'s apartment, [the Victim]'s sister, Kahlia, was able to see a gun on the right side of his hip. After visiting a friend following her argument with [Appellant], [the Victim] returned to her apartment to wait for [Appellant] to return her cell phone.

The fact that [Appellant] had taken [the Victim]'s cell phone was confirmed by several witnesses. The [V]ictim's sister saw the cell phone in [Appellant]'s hand. The [V]ictim's mother, Barbara Robinson, testified that she was at the [V]ictim's apartment several times in the late morning/early afternoon to pick up her daughter, but stated that [the Victim] would not go with her until [Appellant] returned her phone. Additionally, the [V]ictim indicated to her friend, Janai Curry, that [Appellant] had her cell phone and she was waiting for him to return it to her.

According to the recorded statement that Mr. Lee gave to the police on the night of the shooting, [Appellant] was at [the Victim]'s apartment, engaged in an argument with her, upon Mr. Lee's arrival at the apartment, which was approximately fifteen (15) minutes prior to the shooting. Mr. Lee told the police that, after some period of argument, [Appellant] got up to leave the apartment. As he was walking out the door, the [V]ictim said something to [Appellant], at which point [Appellant] turned toward her, pulled his gun, and shot her in the face. [The Victim] immediately fell to the floor. Mr. Lee initially grabbed [the Victim], then ran outside, looking upstairs of [the Victim]'s apartment, and yelled to the upstairs neighbor, Floorine Turner, to call an ambulance.

Ms. Turner's daughter-in-law, who was also in the upstairs apartment, called the police, and Ms. Turner proceeded downstairs, first to [the Victim]'s sister's apartment and then to the [V]ictim's apartment. As she was descending the stairs, she saw [Appellant] going in and out of the front door. [Appellant] was saying that he was sorry and to [take] care of "my baby." Ms. Turner also overheard Mr. Lee telling [Appellant] that he needed to get out of there. Ms. Turner positively identified [Appellant], Harry Green, as the [V]ictim's boyfriend and as the person going in and out of the apartment door.

Ms. Janai Curry, who had spent time with [the Victim] that afternoon in the hours before the shooting and whom [the Victim] had told that she wanted to leave [Appellant], also saw [Appellant] after the shooting. As she was walking down the street, returning to her home, she received a frantic telephone call from Mr. Lee using the [V]ictim's phone. The fact that [the Victim]'s cell phone was back at her apartment confirm[ed] [Appellant]'s presence at the scene. The telephone call informed her of the shooting that had just occurred. Ms. Curry then immediately saw [Appellant] leaving the area of the [V]ictim's apartment and walking down the nearby city steps. Ms. Curry testified credibly that she observed that he was wearing a white shirt with blood on the front of it.

Both Mr. Lee and Ms. Turner positively identified [Appellant] via photo array when questioned by police. Mr. Lee also relayed what he had witnessed to the [V]ictim's mother and described the events leading up to the shooting to her. Ms. Turner, an unbiased witness with no real connection to anyone involved in this incident, was the most credible and convincing witness at trial.

Trial Court Opinion (TCO), 12/21/12, at 2–5.

At CP–02–CR–0013983–2010, the Commonwealth charged Appellant with murder, 18 Pa.C.S. § 2502, for the death of the Victim. At CP–02–CR–0001065–2011, the Commonwealth charged Appellant with carrying a firearm without a license, 18 Pa.C.S. § 6106. These cases were consolidated and tried non-jury before the Honorable Beth A. Lazzara in the Court of Common Pleas of Allegheny County, Criminal Division. On September 20, 2011, the trial court returned a verdict finding Appellant guilty of carrying a firearm without a license and third-degree murder, 18 Pa. C.S. § 2502(c). On December 16, 2011, the trial court sentenced Appellant to a term of 20–40 years' incarceration for third-degree murder, and a consecutive term of 18–36 months' incarceration for the firearm offense.

Appellant filed timely post-sentence motions which were denied by order dated February 28, 2012. Appellant then filed a timely appeal with this Court on March 29, 2012. Appellant submitted a timely Pa. R.A.P. 1925(b) concise statement to the trial court on May 11, 2011, and the trial court filed its 1925(a) opinion on December 21, 2012.

Appellant raises the following questions for our review:

1. Did the lower court err in admitting hearsay evidence under the "state of mind" exception to the hearsay rule when the state of mind of the victim was not at issue?

2. Did the lower court err by admitting hearsay statements which conveyed mixed messages, were mere commentary on the state of a relationship and did not contain threats?

3. Was it improper for the lower court to allow evidence of prior acts under the "history of the case" exception to the

ban on prior bad acts evidence when that evidence lacks probative value and only serves to cast the Appellant in a bad light and unfairly prejudice the factfinder?

4. Was it improper for the lower court to allow testimony given by the mother of the decedent when she could not testify to any material facts concerning the case?

Appellant's Brief, at 4.

We begin by addressing Appellant's first two claims of error as they both concern the admission of the same hearsay statements. Appellant's first claim posits that the trial court erred when it admitted the hearsay testimony of two witnesses under the "state of mind" exception to the hearsay rule. Tiffeny Saunders, one of the Victim's friends, was permitted to testify that the Victim told her "that she just needed to get away from" Appellant in the months prior to the shooting. N.T., 9/19–20/11, at 94. Kahlia Trowery, the Victim's sister, was permitted to testify that on August 4, 2010, the Victim told her that she was afraid of Appellant and that she did not want "to go with him" anymore. *Id.* at 82–83.

The statements of the Victim, as conveyed by Saunders and Trowery, certainly concerned the Victim's state of mind in the weeks and months that preceded the shooting. However, Appellant complains:

> None of the statements concern the state of mind of the accused ... and are therefore not at issue. As the Court stated in [*Commonwealth v.*] *Thornton* [494 Pa. 260, 431 A.2d 248 (1981) ], such statements of the victim are only relevant when taken for the truth of the matter that [the Victim] wanted to get away and that she was scared of him. However, when considered for their truth, they are not within the hearsay exception.

Appellant's Brief, at 19. In Appellant's second issue, he asserts these same hearsay statements were inadmissible under *Commonwealth v. Levanduski,* 907 A.2d 3 (Pa.Super.2006) (*en banc* ).

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). Hearsay "is not admissible except as provided by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802. One of the more well-established exceptions to the inadmissibility of hearsay evidence, commonly referred to as the 'state of mind' exception, is set forth among other hearsay exceptions in Pa.R.E. 803. Specifically, Rule 803(3) provides an exception to the hearsay rule for:

> **(3) Then–Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(3).

In *Thornton,* the defendant, charged with homicide, admitted that he shot and killed the victim but claimed self-defense and asserted that he had been provoked by the victim. *Thornton,* 431 A.2d at 249. The night before the killing, the police arrested the victim and found that he was in possession of a gun. When asked why he was carrying a gun, the victim responded that he was carrying it for protection because "the Thornton brothers were after him." *Id.* at 251. Over the defendant's hearsay objection, the trial court permitted

the officer's testimony. Our Supreme Court ultimately held that the trial court erroneously admitted the victim's statement under the 'state of mind' exception:

> The Commonwealth argues that Moore's declaration that he wanted protection because "the Thornton brothers were after him" was admissible to establish fear on the part of Moore and thus comes within the "state of mind" exception to the rule against hearsay. It is true that the declaration perhaps tends to establish that the victim, Moore, was fearful of the Thorntons. However, the victim's state of mind was not a matter in issue in the case. It was [the] appellant's state of mind, not that of the victim, which was material to establish the degree of guilt, if any, on the charge of criminal homicide.
>
> Only when the declaration is considered for the truth of the matter asserted, that appellant and his brother "were after" the victim, does the declaration become relevant, that is, both material to and probative of appellant's intent to kill. However, when considered for its substantive truth, the declaration, although relevant, is incompetent and hence inadmissible because it is hearsay not within any exception. Thus appellant's objection to admission of the declaration should have been sustained and the testimony excluded.

*Id.* (internal citation omitted).

However, in *Commonwealth v. Sneeringer*, 447 Pa.Super. 241, 668 A.2d 1167 (1995), this Court held that a lower court did not err when it admitted hearsay testimony concerning a victim's statement that she intended to end her relationship with the defendant accused of killing her. Applying the 'state of mind' exception, this Court reasoned as follows:

> The fact that the victim intended to end her relationship with appellant made it

more probable that she did end the relationship, than if she had no such intention. Moreover, if the victim did end her relationship with appellant, then such a factor is probative of appellant's motive. The mere fact that the victim expressed an intent to end her relationship with appellant does not establish that she did in fact do so. It does, however, allow the jury to infer appellant's motive from such a revelation, and is properly considered in resolving the question of whether appellant killed the victim.

*Sneeringer*, 668 A.2d at 1171–72.

In *Levanduski*, an *en banc* panel of this Court recognized an apparent conflict between our Supreme Court's ruling in *Thornton* and the panel decision of this Court in *Sneeringer* in their application of the 'state of mind' exception. The 'state of mind' exception at issue in *Levanduski* involved a letter, written by the victim, Sandt, describing several letters he found in which the appellant (the victim's common law wife) had written and received from a man (Fransen) that he suspected of being his wife's lover. Sandt's letter described that in one of the appellant's letters, she discussed getting "rid of [Sandt] so [the appellant and her lover] could be together." *Levanduski*, 907 A.2d at 9. Furthermore,

> [i]n his letter, Mr. Sandt wrote about the relationship between Appellant and Mr. Fransen and referred to: Appellant's allegations of spousal abuse; Appellant's desire to further her relationship with Mr. Fransen; Mr. Sandt's own demand for his share of the marital property; and, the possible nexus between Appellant and Mr. Fransen, and Mr. Sandt's missing .22 caliber revolver.

*Id.* at 18.

Contrary to the assertion of Appellant, the *Levanduski* Court did not reject the

*Sneeringer* approach outright, but instead distinguished itself on the facts and, consequently, applied the general rule of *Thornton.* In fact, the *Levanduski* Court noted an approach similar to that applied in *Sneeringer* had been applied by our Supreme Court in *Commonwealth v. Stallworth,* 566 Pa. 349, 781 A.2d 110, 118 (2001). However, the *Levanduski* court refused to apply the *Sneeringer* standard because:

> The letter in the instant case does not generate the same probative value as the victims' statements in the cited cases [ (*Sneeringer* and *Stallworth* )]. Here, Mr. Sandt's letter is mostly his commentary on the relationship between the codefendants. In fact, the trial court admitted the letter as evidence of the relationship between Appellant and Mr. Fransen. On the other hand, the letter conveys a very mixed message regarding the state of the relationship between Appellant and Mr. Sandt, vacillating between possible separation and promises of reconciliation. Significantly, the letter does not contain any threats made on Mr. Sandt's life, by either Appellant or Mr. Fransen. At most, the letter represents pure conjecture well-seasoned with romantic hyperbole.

*Levanduski,* 907 A.2d at 20. Nevertheless, the *Levanduski* court ultimately ruled that "Mr. Sandt's letter was merely cumulative of other untainted evidence" and, therefore, "the court's evidentiary ruling to admit the letter was harmless error." *Id.* at 22.

Here, as Appellant correctly asserts, the Victim's state of mind was not relevant to the prosecution's allegations. However, there is a rational if weak argument to be made that the statements were relevant, apart from the truth of the matters asserted, to establish that Appellant was in a relationship with the victim, thus providing some modicum of proof regarding Appellant's identity as the shooter. Yet, there did not appear to be any dispute at trial that the relationship existed and, thus, the value of such evidence to suggest an inference that Appellant was the shooter is trifling.

Considering the statements as evidence of Appellant's motive, it appears impossible to demonstrate such an inference without accepting the statements for the truth of the matter asserted. To be relevant as to Appellant's motive, we would have to accept that the Victim was fearful of Appellant and that she was attempting to end their relationship. To accept those conclusions as the basis for Appellant's motive is to accept the literal "truth" of the hearsay statements. If the Victim was not, in fact, fearful of Appellant and in the process of ending their relationship, then there was nothing about the hearsay statements that provided evidence of motive. Put more succinctly, it is only when the admitted hearsay statements are taken as truthful that they provide competent evidence of motive. *Thornton* rejected the admission of such statements under the 'state of mind' exception to the hearsay rule. Either these statements were relevant but inadmissible as hearsay without an applicable exception, or they were not hearsay, in which case they were irrelevant.

*Sneeringer,* a panel decision, may be interpreted to suggest a different result under the facts presented by this case, but such an interpretation would directly conflict with our Supreme Court's ruling in *Thornton.* To the extent *Sneeringer* is still viable, *Levanduski* suggests a case-by-case approach whereby *Thornton* stands as the general rule under which a limited exception may exist when the inference generated by admission of the hearsay statement is strong and highly proba-

tive. Here, the application of such an exception to *Thornton* was not justified. We conclude, therefore, that the trial court abused its discretion when it admitted the complained of hearsay statements under the 'state of mind' exception.[1]

■■■ Nevertheless, the Commonwealth asserts the admission of these hearsay statements constituted harmless error. We agree.

It is well established that an error is harmless only if we are convinced beyond a reasonable doubt that there is no reasonable possibility that the error could have contributed to the verdict. The Commonwealth bears the burden of establishing the harmlessness of the error. This burden is satisfied when the Commonwealth is able to show that: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial [e]f-

fect of the error so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Laich*, 566 Pa. 19, 777 A.2d 1057, 1062–63 (2001) (internal citations omitted).

In its opinion, the trial court stated "this court inferred malice from the fact that [Appellant] fired a single bullet into [the Victim's] face/head, killing her. Clearly, this was use of a deadly weapon on a vital part of [the Victim's] body. This was the primary reason for this court's malice finding." TCO, at 12. Furthermore, the trial court indicated that it found credible Terrence Lee's statement to police that identified Appellant as the shooter, and the trial court did not find credible his in-court testimony which recanted that identification. *Id.* at 2 fn. 2. Given these facts, there was clearly both sufficient and compelling evidence of Appellant's guilt as to the charge of third-degree murder, and it strains reason to believe that the erroneously admitted hearsay statements in question significantly affected the verdict, particularly since the erroneously admitted statements were not heard by a jury, but were instead heard by a trial court judge

1. In his concurring opinion, Judge Strassburger raises several issues supporting his conclusion that these statements were admissible under Pa.R.E. 803(3) (A statement of the declarant's then-existing mental, emotional, or physical condition). Unfortunately, to give each individual proposition he raises due consideration would render this Opinion more expansive than the subject matter already demands. As a general reply, however, we highlight that Hearsay is inherently unreliable, and, therefore, its admission risks significant prejudice to the party against whom the statement is being offered. Hearsay exceptions exist not because the courts wish to salvage any potential relevant evidence, but because the exceptions themselves present circumstances in which the statement at issue's reliability is restored or its unreliability is mitigated.

Our colleague acknowledges that a non-defendant's hearsay statement is inadmissible (for the truth of the matter asserted) to *directly* prove a defendant's motive, yet he argues for its admissibility (for the truth of the matter asserted) to *indirectly* prove a defendant's motive. But how has the reliability of these hearsay statements been restored, or their unreliability mitigated? It cannot simply be because the declarant's statement is probative of her intent or motive, and that her intent or motive is probative of Appellant's intent or motive. This is merely a linguistic joust. The statements were being offered to show Appellant's state of mind, the only relevant state of mind in this criminal trial. The indirectness of that connection, despite its internal logic, does nothing to alleviate the fact that the person conveying the statement in court may have misheard, misunderstood, or even manufactured the declarant's statement.

sitting as the trier of fact. Thus, we conclude that the trial court's error in admitting the hearsay statements was harmless, as the prejudice caused was *de minimis*.

■ Next, Appellant complains that the trial court erred when it admitted evidence of Appellant's prior bad acts. Specifically, Janai Curry testified regarding an incident she witnessed that occurred two or three months before the shooting. N.T., 9/19–20/11, at 109. Curry recounted that she and the Victim were preparing to go out to a club. *Id.* The Victim was in the bathroom fixing her hair when Appellant entered with a gun and said "where the F are you going[?]" *Id.* Appellant pointed the gun at the Victim when he made the statement. *Id.* at 110. Although Curry described the event as Appellant "playing with her," she also said that it made the Victim "upset because she felt like why are you playing with a gun, and why you [sic] point it at my face?" [2] *Id.*

Appellant asserts that "this act does not make it any more or less likely that [Appellant] committed the crime he was accused of in this case. It only serves to prejudice the fact-finder and cast ... [A]ppellant in a bad light." Appellant's Brief, at 23. The Commonwealth asserts that the prior incident was relevant and admissible to prove "motive, intent, and lack of accident, as well as to complete the history of the case." Commonwealth's Brief, at 26.

■ In its opinion, the trial court noted that it "limited prior acts testimony to incidents directly observed by the witnesses, not incidents related to them by [the Victim]." TCO, at 8. Regarding this specific event, the trial court stated, "[e]vidence of prior incidents of abuse, including ... pointing a gun at her, helped establish the chain of events and pattern of conduct that eventually led to the shooting. The prior bad acts at issue were also relevant to show intent, lack of mistake or accident, ill-will, malice, and the overall nature of [Appellant's] relationship with [the Victim]." *Id.* at 10.

> Rulings on the admissibility of evidence are within the discretion of the trial judge, and such rulings form no basis for a grant of appellate relief absent an abuse of discretion. While it is true that evidence of prior crimes and bad acts is generally inadmissible if offered for the sole purpose of demonstrating the defendant's bad character or criminal propensity, the same evidence may be admissible where relevant for another purpose. Examples of other such relevant purposes include showing the defendant's motive in committing the crime on trial, the absence of mistake or accident, a common scheme or design, or to establish identity.... [T]he evidence may also be admitted where the acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development. Of course, in addition to the relevance requirement, any ruling on the admissibility of evidence is subject to the probative value/prejudicial effect balancing that attends all evidentiary rulings.

*Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 419 (2008) (internal citations omitted).

■ The ban on prior bad acts evidence, and the lion's share of associated exceptions noted in *Powell, supra*, are set forth in Pa.R.E. 404(b). The *res gestae* or "history of the case" exception, however, does not spring from Pa.R.E. 404. It is a:

> "special circumstance[,]" [one] where evidence of other crimes may be relevant

---

2. Hereinafter, we shall refer to this series of events as the "gun-pointing incident."

and admissible ... where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. *Commonwealth v. Murphy*, 346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985), quoting *Commonwealth v. Williams*, 307 Pa. 134, 148, 160 A. 602, 607 (1932). This special circumstance, sometimes referred to as the *"res gestae"* exception to the general proscription against evidence of other crimes, is also known as the "complete story" rationale, *i.e.*, evidence of other criminal acts is admissible "to complete the story of the crime on trial by proving its *immediate* context of happenings *near in time and place."*

*Commonwealth v. Lark*, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988) (emphasis added).[3]

In the instant case, the *res gestae* exception is not applicable to admit evidence of the gun-pointing incident. The delay in time between the incident and the shooting, which was *at least* two months, is by itself strongly suggestive that the exception does not apply. Nevertheless, there is no specific timeframe that dictates the applicability of the exception. However, it is also clear that the gun-pointing incident was in no way part of the same transaction or sequence of events that constituted the crime for which Appellant was being tried. In *Lark*, by contrast, the admission of

prior bad acts was justified because "[e]ach of these [prior bad acts] were interwoven in a tangled web of threats, intimidation and criminal activity which arose from the robbery in 1978 of Tae Bong Cho[.]" *Lark*, 543 A.2d at 497–98. As the *Lark* court explained, Lark:

was found guilty of two counts of kidnapping which is demonstrated (for our purposes herein) where the person "unlawfully confines another for a substantial period in a place of isolation" with the intent to hold the other as a shield or hostage or to facilitate flight after commission of a felony. This kidnapping stemmed directly from appellant's attempt to avoid capture for his onslaught of criminal activity including his robbery of Tae Bong Cho (and the conviction therefor), the subsequent murder of this victim, and his plans to kill Assistant District Attorney, Charles Cunningham. As such, this evidence demonstrated consciousness of guilt and attempt to escape the consequences of his various crimes. Moreover, the facts and circumstances surrounding the kidnapping and appellant's arrest provided direct evidentiary links to the other crimes. While holding Sheila Morris and her children hostage, appellant threatened to shoot the police as he did "the chinkee m—— f——," a threat which obviously linked him to the shooting of Tae Bong Cho. The blue bag which appellant had with him at the

---

**3.** This common law exception of *res gestae* has survived its omission from Pennsylvania's Rules of Evidence. There has been a tendency by the Commonwealth, however, to expand the exception beyond its original meaning. As this Court has recently stated in *Commonwealth v. Brown*, 52 A.3d 320, 332 (Pa.Super.2012), when addressing the application of the *res gestae* exception to evidence of acts that occurred decades prior to the conduct for which the defendant was being tried:

the history of the *res gestae* exception demonstrates that it is properly invoked when the bad acts are part of the same transaction involving the charged crime. We have found no case analogous to the one presented herein, nor has the Commonwealth cited to a single case where the sole exception to allowing the bad acts evidence was the *res gestae*/natural development exception and the evidence was not close in time and place from the acts charged.

*Brown*, 52 A.3d at 332 (emphasis added).

time of his arrest contained the address and phone number of Mr. Cunningham's parents and grandfather and indicated that he was in the process of carrying out the terroristic threats made to Cunningham when he was spotted, chased and arrested. The murder of Mr. Cho and the terroristic threats against Mr. Cunningham were inextricably interwoven, therefore, with the kidnapping of Ms. Morris and her children and were relevant to show motive, intent and to show the natural development of the case.

*Id.* at 498.

Thus, the crimes which constituted the prior bad acts evidence in *Lark* were all part of a chain of events of various crimes that occurred that were inextricably interrelated. Here, there is no such inextricable relationship between the gun-pointing incident and the shooting two months later, other than, as we discuss below, evidence of motive or absence (or presence) of mistake or accident. Those Pa.R.E. 404(b)(2) based exceptions, also present in *Lark*, often co-exist with or are present when a proper *res gestae* exception applies. However, 'evidence of motive' or 'absence of mistake' are not the basis for the application of *res gestae* exception, which is properly applied only "when the bad acts are part of the same transaction involving the charged crime." *Brown*, 52 A.3d at 332. It is, perhaps, the frequency with which these different exceptions apply simultaneously that has led to confusion regarding the applicability of the *res gestae* exception.

The gun-pointing incident at issue, however, did provide evidence of motive or absence of mistake, justifying its admission

under Pa.R.E. 404(b)(2). The incident suggested a motive because it tended to demonstrate Appellant's jealous and overly-possessive attitude with respect to the victim. However, the gun-pointing incident was even more relevant to the issue of whether the shooting was a mistake or an accident. Appellant's repeated behavior of pointing a gun at the Victim tends to suggest he engaged in highly risky behavior relevant to the *mens rea* of the offenses for which he was tried. Assuming Appellant's characterization of events, specifically his contention that the gun-pointing incident was mere play,[4] the prior bad act also could have tended to show that the shooting *was* an accident or mistake. Taken as evidence of mistake or accident, the gun-pointing incident was highly relevant to the degree of guilt at issue in this case, which ran the gamut from first-degree murder to involuntary manslaughter. Accordingly, we conclude that the trial court did not abuse its discretion by admitting evidence of the gun-pointing incident.

Appellant's final claim posits that the trial court abused its discretion by permitting the Victim's mother to testify regarding her daughter's state of mind and other irrelevant matters. Appellant claims the mother's testimony was unfairly prejudicial as it tended to arouse sympathy for the Victim. Appellant directs our attention to the following:

Ms. Robinson was permitted to testify over defense objection that after her daughter became involved with Mr. Green, she was never happy. [N.T., 9/19–20/11, at 68.] The remainder of Ms. Robinson's testimony centered around the time she spent with [the Victim] on the day of August 9, 2010.

---

4. We note that the characterization of the gun-pointing incident as mere play arguably takes it out of the ban on prior bad acts evidence altogether. Nevertheless, because

we conclude that the incident is admissible under the Rule 404(b)(2) exceptions to the ban, further discussion of this point is merely academic.

This testimony detailed how Ms. Robinson took Kahlia's daughter to [the Victim]'s house in the morning, how she went to an interview for a nursing job, went back to [the Victim]'s house, picked up Kahlia and her granddaughter, drove home, then drove back to [the Victim]'s house, left again, picked up some groceries and returned to [the Victim]'s [house] one more time. Next, Ms. Robinson returned home and received the call that [the Victim] had been shot. After all of this testimony, Ms. Robinson finally detailed how she had a conversation with Mr. Terrence Lee at the police station. Of all of her testimony, the only relevant portion was her conversation with Terrence Lee and [its] only relevance was the fact that Mr. Lee made an inconsistent statement.

Appellant's Brief, at 25–26.

We agree with Appellant that some segments of Ms. Robinson's testimony were irrelevant. However, some portions of Ms. Robinson's testimony, downplayed by Appellant in the passage above, were certainly relevant to establish the chain of custody of the Victim's cell phone on August 9, 2010. It had been established by other testimony that Appellant took the Victim's cell phone early that day. N.T., 9/19–20/11, at 68. Ms. Robinson intended on picking up her daughter (the Victim) that day, and on three occasions went to her apartment to do so, but because the Victim was waiting for Appellant to return the phone, she did not leave with her mother. After the shooting, it was determined that Terrence Lee used that same cell phone to call the Victim's sister. N.T., 9/19–20/11, at 17. Thus, Ms. Robinson's testimony, coupled with the fact that the cell phone was in the Victim's apartment after the shooting despite having been taken by Appellant earlier in the day, tended to establish that Appellant returned to the Victim's apartment after Ms. Robinson made her third attempt at picking up the Victim. This evidence established a timeframe for the killing and strongly suggested that Appellant returned to the Victim's apartment just before the shooting occurred.

■ However, the evidence concerning the Victim's 'happiness' before and after she became involved in a relationship with Appellant was not relevant for any purpose at issue in this case and, thus, such evidence should not have been admitted. Nevertheless, the Commonwealth argues that, even if such evidence was admitted erroneously, its admission constituted harmless error. We agree.

■ Considering the test for harmless error set forth in *Laich, supra,* Ms. Robinson's testimony concerning her daughter's state of mind was largely cumulative of the direct observations made by other witnesses that provided evidence tending to show the deterioration of the relationship between Appellant and the Victim. Furthermore, the prejudice endured by Appellant was minimal, particularly in light of the fact that this case was not tried before a jury. There is no indication of record that the trial court placed undue emphasis on the state of mind of the Victim in this case, or on any other irrelevant portion of Ms. Robinson's testimony. Accordingly, we conclude it was harmless error to admit the portions of Ms. Robinson's testimony that were irrelevant.

Judgment of sentence *affirmed.*

Judge STRASSBURGER files a concurring opinion.

### CONCURRING OPINION BY STRASSBURGER, J.

I concur with the conclusion that Appellant's judgment of sentence should be affirmed. However, I write separately to note my disagreement with the Majority's

analysis of whether the Victim's statements to her friend and her sister "that she just needed to get away from" Appellant, that she was afraid of Appellant, and that she did not want "to go with him" anymore, were inadmissible hearsay.

The Majority concludes, in effect, that our Supreme Court's decision in *Commonwealth v. Thornton*, 494 Pa. 260, 431 A.2d 248 (1981), prohibits the admission of hearsay statements made by victims in murder cases, despite the "then-existing state of mind" exception to the hearsay rule, and that this Court's decisions since *Thornton* indicate that "a limited exception may exist when the inference generated by admission of the hearsay statement is strong and highly probative." Majority Opinion at 581–82. In reaching this conclusion, the Majority Opinion overlooks the plain language of Pa.R.E. 803(3), and does not consider adequately decisions by this Court and our Supreme Court that reach contrary results, including the recently-decided *Commonwealth v. Luster*, 71 A.3d 1029 (Pa.Super.2013) (*en banc*).[1]

Rule 803(3), as it currently stands,[2] reads as follows:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> \*     \*     \*
>
> **(3) Then–Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(3).

Considering the plain language of this Rule, the Victim's statements in the in-

---

1. *Luster* dealt with statements by a murder victim that she was afraid Luster "was going to do something real bad to her," that she was "scared," and that Luster was "trying to kill" her. 71 A.3d at 1041. This Court concluded that the statements were admissible because they showed Luster's ill will and malice toward the victim. *Id.* at 1042; *see also, e.g., Commonwealth v. Chandler*, 554 Pa. 401, 721 A.2d 1040 (1998).

    In *Chandler*, the trial court admitted into evidence "eyewitness observations of [the victim's] family and co-workers, which were not hearsay, and ... statements [the victim] made concerning her negative feelings about [Chandler] and her relationship with him." 721 A.2d at 1045. Our Supreme Court concluded that the victim's "statements were admissible under the 'state of mind' exception to the hearsay rule because [the victim's] opinion of [Chandler] and her marriage to him went to the presence of ill will, malice, or motive for the killing." *Id.*

2. "The Pennsylvania Supreme Court has promulgated new rules of evidence, which [took] effect on March 18, 2013. The rule changes result in no substantive change and are intended to conform the Pennsylvania rules, which reference the federal rules of evidence, with the stylistic changes made to the federal rules[.]" *Schmalz v. Manufacturers & Traders Trust Co.*, 67 A.3d 800, 804 n. 4 (Pa.Super.2013) At the time of Appellant's trial, Pa. R.E. 803(3) read as follows:

    > The following statements, as hereinafter defined, are not excluded by the hearsay rule, even though the declarant is available as a witness:
    >
    > \*     \*     \*
    >
    > (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health. A statement of memory or belief offered to prove the fact remembered or believed is included in this exception only if it relates to the execution, revocation, identification, or terms of declarant's will.

stant matter were admissible as declarations of her then-existing intent and mental feeling.[3] Nonetheless, the Majority concludes that "*Thornton* rejected the admission of such statements under the 'state of mind' exception to the hearsay rule. Either these statements were relevant but inadmissible as hearsay without an applicable exception, or they were not hearsay in which case they were irrelevant." Majority Opinion at 581.

The statement at issue in *Thornton* is readily distinguishable from the statements at issue here. Applying Rule 803(3),[4] it is clear why a statement like the one in *Thornton* is not admissible under the then-existing state of mind exception. Rule 803(3) expressly bars "statement[s] of memory or belief [offered] to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." The victim's statement in *Thornton*, if accepted for its truth, would be a statement of belief offered to prove the fact believed (that the Thornton brothers were "after" the victim). Moreover, Rule 803(3) applies only to statements of the **declarant's** state of mind. If accepted for its truth, the statement of the victim in *Thornton* was not a declaration of the victim's state of mind, but of the Thornton brothers' state of mind.

Instantly, the Majority acknowledges that this Court's decision in *Commonwealth v. Sneeringer*, 447 Pa.Super. 241, 668 A.2d 1167 (1995) dealt with a factual situation similar to the present matter, but concludes that applying *Sneeringer* to this case would "directly conflict" with *Thorn-*

*ton.* Majority Opinion at 581. Unlike in *Thornton*, the statements at issue in *Sneeringer* were not statements of memory or belief offered to prove the fact remembered or believed. They were not statements offered to prove directly the mental state of someone other than the declarant. Rather, these statements were statements of the victim's intent or plan. While the victim's state of mind was not directly at issue in the case, the victim's intent to break up with Sneeringer was admissible as evidence that she did, in fact, endeavor to end her relationship. If accepted as proof that the victim attempted to break up with Sneeringer, these statements would be highly probative of Sneeringer's possible motive for the killing. *Sneeringer* is not inconsistent with *Thornton.*

The Majority opines that the second of these two distinctions, that the statements at issue were not offered to prove directly the mental state of Sneeringer, "does nothing to alleviate the fact that the person conveying the statement in court may have misheard, misunderstood, or even manufactured the declarant's statement," and describes it as "merely a linguistic joust." Majority Opinion at 582 n. 1.

First, I note that the hearsay exceptions enumerated in Rule 803 were not intended to apply to situations where it is less likely that someone will have *misheard* the statements in question. For example, Rule 803(2) provides an exception for hearsay statements that are "excited utterances." There is nothing about an excited utter-

---

**3.** As observed by the Commonwealth, the Victim's statements that she was afraid of Appellant and did not want to "go with" him were not objected to at trial. Commonwealth's Brief at 9. Accordingly, Appellant's challenge to these statements is waived. *See Commonwealth v. Nypaver*, 69 A.3d 708, 718 (Pa.Super.2013). In light of the Majority's discus-

sion, however, I also address the admissibility of these statements.

**4.** Admittedly, Pennsylvania first adopted its Rules of Evidence in 1998. Thus, at the time *Thornton* was decided (that is, in 1981), Rule 803(3) was not in place, and *Thornton* was not a case interpreting the Rule.

ance that makes it less likely that someone will mishear or misunderstand that statement. Rather, the point is that when someone says something in an excited state, it is less likely that he or she fabricated that statement. *Commonwealth v. Wholaver*, 605 Pa. 325, 989 A.2d 883, 909 (2010) (Castille, J. concurring) ("The underlying rationale of the excited utterance exception is the notion that a statement made in the excitement of a startling event, before the speaker has the opportunity to reflect on the event, has sufficient indicia of truthfulness to warrant admission."). Similarly, whether or not someone might have misheard the Victim's statement in the present case is not determinative of its admissibility.

As for what makes these types of statements reliable,

> the special assurance of reliability for statements of present state of mind rests upon their spontaneity and resulting probable sincerity. The guarantee of reliability is assured principally by the requirement that the statements must relate to a condition of mind or emotion existing at the time of the statement. In addition, some formulations of the exception require that the statement must have been made under circumstances indicating apparent sincerity, although Federal Rule 803(3) [which is identical to Pa.R.E. 803(3) ] imposes no such explicit condition.

McCormick on Evidence § 274 (7th ed.) (footnotes omitted); *Schmalz*, 67 A.3d at 804 ("Traditionally, statements of the declarant's then existing state of mind are considered reliable based on their sponta-

neity."). Our Supreme Court has also observed that

> [i]ntention, viewed as a state of mind, is a fact, and the commonest way for such a fact to evince itself is through spoken or written declarations. It is therefore because of the impossibility, in many cases, of proving intention apart from personal declarations, that they are admitted. The true basis of their admission, then, is necessity, because of which an exception to the hearsay rule is recognized. . . .

*Commonwealth v. Begley*, 566 Pa. 239, 780 A.2d 605, 623 (2001) (quoting *Commonwealth v. Marshall*, 287 Pa. 512, 135 A. 301, 304 (1926)).

Additionally, stressing the distinction between stating directly a defendant's state of mind (*e.g.*, "he killed her because he was upset that she broke up with him"), and proving that state of mind indirectly with circumstantial evidence (*e.g.*, a victim saying "I intend to break up with" the defendant as evidence that she did so), is not "merely a linguistic joust." Our Courts have held consistently that statements of a victim's intent may be offered to prove that a victim acted in accordance with that intent.[5] *Schmalz*, 67 A.3d at 804 ("[T]he exception can apply to demonstrate that a declarant did a particular act that was in conformity with his or her statement after having made the statement."); *Begley*, 780 A.2d at 624 ("[A] deceased victim's out-of-court statements evincing an intent to meet the defendant shortly before the killing are admissible pursuant to the state of mind exception because such an intent provides circumstantial

---

5. This concept is not specific to Pennsylvania. Indeed, the U.S. Supreme Court applied this rule in *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). Federal Rule of Evidence 803, on which the Pennsylvania Rule was based, was intended to preserve it. F.R.E. 803, Note to Paragraph (3) (1972 Advisory Committee Notes) ("The rule of [*Mutual Life Ins. Co.*] allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed.").

proof that the victim acted in accordance with his or her stated intent[.]").

Given the foregoing discussion, it is clear that the Victim's first two statements were properly admitted under Rule 803(3). Like the statements in *Sneeringer,* the Victim's statements that she did not want "to go with" Appellant anymore and that she "just needed to get away from" him make it more likely that she endeavored to end her relationship with Appellant, and supply a possible motive for Appellant to commit the killing. Unlike the statements in *Thornton,* the instant statements were not being offered to prove the mental state of Appellant directly, and were not statements of memory or belief offered to prove a fact remembered or believed.

As for the third statement at issue here, that the Victim was afraid of Appellant, this presents a closer question. Our Supreme Court has previously indicated that fear on the part of a victim is irrelevant in a homicide prosecution. *Commonwealth v. Auker,* 545 Pa. 521, 681 A.2d 1305, 1319 (1996) ("Although a victim's fear of a defendant is irrelevant to the charge of criminal homicide, it is relevant to a charge of kidnapping, since one of the issues is the victim's willingness to go with [Auker].") (citation omitted). However, the Court has seemingly softened its stance on this issue. *Commonwealth v. Moore,* 594 Pa. 619, 937 A.2d 1062, 1072 (2007) ("While under some of this Court's decisions, these statements would be admissible as circumstantial evidence of the victim's fear of [Moore], they could not properly be admitted as substantive evidence of these prior incidents over [Moore's] hearsay objection."). Moreover, as noted *supra,* this Court in *Luster* held that "the victim's statement that she feared [Luster] and he was going to harm her is admissible because it shows [Luster's] ill will and malice toward the victim." 71 A.3d at 1042.

Presently, the fact that the Victim was afraid of Appellant is somewhat probative insofar as it tends to explain her statements about not wanting to "go with" Appellant anymore. To the extent that the trial court in the present matter concluded that the Victim's fear was relevant, I would conclude that she did not abuse her discretion in making this determination.

Accordingly, I would conclude that the trial court did not err by admitting the aforementioned statements.