J-A19016-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MARTELL HERRIOTT, | |
| Appellant | No. 358 WDA 2013 |

Appeal from the Judgment of Sentence of October 11, 2012
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0010556-2011

BEFORE: BENDER, P.J.E., OLSON and FITZGERALD,* JJ.

MEMORANDUM BY OLSON, J.: **FILED SEPTEMBER 23, 2014**

Appellant, Martell Herriott, appeals from the judgment of sentence entered on October 11, 2012 in the Criminal Division of the Court of Common Pleas of Allegheny County, as made final by the denial of Appellant's post-sentence motion. We affirm.

At the conclusion of trial on July 24, 2012, the jury found Appellant guilty of first-degree murder[1] and carrying a firearm without a license.[2] On July 25, 2012, the trial court granted a petition to *nolle prose* a charge of persons not to possess a firearm.[3] On October 11, 2012, the trial court

_____

[1] 18 Pa.C.S.A. § 2502(a).

[2] 18 Pa.C.S.A. § 6106(a)(1).

[3] 18 Pa.C.S.A. § 6105(a)(1).

* Former Justice specially assigned to the Superior Court.

sentenced Appellant to serve life in prison without parole for his first-degree murder conviction. The court imposed no further penalty on the charge of carrying a firearm without a license.

The trial court summarized the evidence introduced at Appellant's trial in the following manner:

On June 30, 2011, at approximately 1:25 a.m. Officer [David] McManus was in a marked police car and responded to a dispatch of shots fired. Officer McManus was responding as backup to the unit dispatched to a male down at 5200 Keystone Street [in Pittsburgh, Pennsylvania]. Officer McManus was the first to arrive on scene. Upon arrival, Officer McManus found the victim face down with blood coming from underneath his body. It appeared that he was shot. The victim was unresponsive and appeared to have sustained injuries from at least one bullet. At that time, Officer McManus was approached by a female that stated her son witnessed the shooting. The victim was identified as Sean [Lydell] Thompson. Officer McManus did not observe any weapon or firearm on the victim. The victim was transported to UPMC and pronounced dead at 1:56 a.m. on June 30, 2011. The [young man] who witnessed the shooting was transported to [police] headquarters for questioning, along with his mother. Officer McManus testified that upon his arrival the street was very well lit. Officer McManus testified that there were some porch lights on; however, some parts of the street were darker, but not dark.

Prosecution witness, Rachel Zwipf, was engaged to Mr. Thompson. She testified that they lived together with her older son in Lawrenceville at the time of the murder. [Ms. Zwipf] testified [that] on the evening of June 27, 2011, while asleep, she received a phone call from Mr. Thompson. Mr. Thompson asked Ms. Zwipf to come and meet him at the pizza shop next to the bar ("Remedy") because it was really important. Mr. Thompson and Ms. Zwipf went back and forth because she did not want to go and he wouldn't give a direct reason why he wanted her to meet him. She subsequently got out of bed and drove to the bar Remedy [], located a few minutes from her home. Ms. Zwipf testified that there was a sense of urgency in

the demeanor of Mr. Thompson when he was requesting her to get inside the bar. Mr. Thompson introduced her to several gentlemen. One of these men was [Appellant]. Ms. Zwipf testified she was in close proximity to Mr. Thompson and [Appellant]. She heard Mr. Thompson state to [Appellant], "I am not into that anymore." Ms. Zwipf testified that Mr. Thompson's sense of urgency did not fade when she met him at the bar, and it appeared to her that he was trying to make a point. [Appellant] and Ms. Zwipf were in the bar for approximately fifteen minutes before they both left the bar. While in the bar, Ms. Zwipf testified [that Appellant] was wearing a fisherman style hat. [Appellant] came outside of the bar when the couple left and interrupted in their conversation and Ms. Zwipf found this suspicious. After about five minutes, [Appellant] went back inside the bar. At some point outside of the bar Mr. Thompson told Ms. Zwipf about a beef, or dispute[,] that a friend of his had with [Appellant], and another man, Montez Freeman. Ms. Zwipf believed that this was part of the reason she was asked to come to the bar by Mr. Thompson. Mr. Thompson told her to walk home, because he did not want them to know what kind of car she drove. Upon Mr. Thompson returning home that night, he indicated he did not want to talk about what was going on with the men she met at the bar.

On June 29, 2011, Mr. Thompson and Ms. Zwipf went to his sister's house on Natrona Way. Approximately, between 10:00 [p.m.] to 10:30 p.m., the two left his sister's house and [*sic*] go to the Remedy. Mr. Thompson left Ms. Zwipf in the car and went inside the bar to get cigarettes for his sister. Prior to entering the bar, Ms. Zwipf testified that Mr. Thompson was in a good mood and they planned on staying in the rest of the evening. Mr. Thompson was in the bar approximately five minutes and returned to the car. Upon his return, his demeanor had changed significantly. He appeared upset and agitated. Mr. Thompson told Ms. Zwipf that he needed to return to the bar after taking her home because he "needed to know what they know." The two had a heated argument at the house. Ms. Zwipf testified that he looked sad, and she was concerned about him returning to the bar. She tried to tell him to stay at home. Mr. Thompson left in the car and she went to bed. Ms. Zwipf woke up around 12:30 a.m., and spoke with Mr. Thompson on a cell phone and he told her he would be home in about fifteen minutes.

Ernestine Jordon, Mr. Thompson's mother, testified that he returned to her and her daughter's house sometime between 12:30 [a.m.] and 1:45 a.m. on June 30, 2011. Officer Evans testified that their address on Natrona Way is literally around the corner from Mr. Thompson's address on Keystone. Ms. Jordon testified her son left her house that morning and within minutes she heard gun shots. Shortly afterward, someone knocked on her door and she was informed that her son had been killed up the street.

On June 30, 2011, Jacob Orcun (referred to earlier as the [young man] who witnessed the shooting) was on the third floor of his house at 5233 Keystone Street at approximately 1:00 a.m. and heard gunshots. He immediately ran to the other room and opened the window. The distance from the house of the witness to the sidewalk was eight feet, 11 inches. The distance from the front of the house to the width of Keystone Street was 29 feet, ten inches. He saw a white SUV and a man holding a gun. He described the man as [an] African American male, heavy set, almost six feet tall, between 20-30 years old, with side burns. Mr. Orcun further testified the gun was black in color and that he did not see the man's hair because he was wearing a fisher[man]'s hat. He further testified that the man moved over the front door of the car and began to shoot over the hood. When he looked out the window there were three lit light posts on the street. After the shooting, Mr. Orcun ran downstairs and told his mom that he had witnessed the shooting. When he told his mom that he had witnessed the shooting she went over to a police officer. A few hours later he was interviewed by the police. Mr. Orcun testified that he had witnessed [Appellant] get out of the car, shoot and walk closer, and shooting more. Subsequently, he picked [Appellant] out of a photo array. Detective [James] McGee testified that as soon as Mr. Orcun looked at the array he saw the photograph; he pointed right to it and said, "That's him."

Ms. Jasmine Lewis was talking with Mr. Thompson just before he was shot on Keystone Street. She started to walk away and heard shots fired. Ms. Lewis was interviewed by the police the following day and identified the shooter through a photo array. The Defendant was the person Ms. Lewis identified in the photo array as the shooter.

Detective Klaczak, from the investigations branch, works the night felony squad. He investigated the scene of the shooting. He recovered fifteen 40 caliber casings on the scene. All the casings had Smith and Wesson on them. Thirteen out of fifteen were brand name Winchester; two of them were PMC.

Firearms expert, Dr. Robert T. Levine, testified that he determined that all fifteen casings were discharged from the same firearm. He further concluded that the firearm was probably a 40-caliber Glock.

On July 23, 2011, at approximately 1:30 a.m. Officer Schmidt received a call from a reliable, confidential informant that a male with an outstanding warrant was located inside the Red Onion Bar located at the intersection of Kirkpatrick Street and Webster Avenue. Officer Schmidt was provided a detailed description of the homicide actor, the male with the outstanding warrant. The actor they were looking for was [Appellant]. Officer Schmidt had a photo of the suspect. Officer Schmidt and Office McManus observed [Appellant] exit the bar and enter a Chevy Tahoe in the rear passenger seat. A pursuit followed. Officer Schmidt was in the passenger seat. His primary responsibility was observing the vehicle and advising police dispatch. There were times during the pursuit he did not have full visibility of the vehicle. One of those times was when the vehicle made a right hand turn onto Jane Street from 24th Street. Officer Schmidt observed a black firearm come out of the passenger window as they continued to pursue the vehicle. Officer Schmidt had a clear view of [Appellant] throwing the firearm out the window. The pursuit ended at 28th and Jane Street where the vehicle stopped. [Appellant] was apprehended and asked to provide his personal information: name, date of birth, social security number, (as the officer does with all his arrests). [Appellant] responded that his name was David Williams.

Officer McManus went back to the scene where [Appellant] threw the gun and recovered a loaded Glock 27, 40-caliber firearm. The gun was loaded with a magazine clip with eight rounds in the magazine and one round in the chamber of the gun. Subsequently, Officer Stern was working on July 23, 2011, and recovered a gun magazine from Jane Street found by a resident. The magazine was made of polymer plastic as opposed to a steel magazine. This magazine, if inserted into a 40 caliber Glock firearm, would hold a total of 32 rounds of ammunition. The 32

rounds of ammunition would consist of 31 rounds in the magazine and 1 round in the guns chamber. Upon review of the video of the chase with [Appellant], the magazine was found on that route. The magazine when found had 17 rounds of ammunition. The 17 rounds of ammunition were manufactured by Winchester.

Officer Stern documented in a police report where the magazine was found and a description of the magazine. When the magazine was turned into the property room, Officer Stern was unaware of the chase earlier in the morning. The magazine was ultimately destroyed by the evidence room. However, Officer Stern was shown a magazine, which was introduced into evidence, that was consistent with the magazine he recovered and documents. Ultimately, it was determined the recovered gun was not the gun used to shoot the victim Mr. Thompson. Simply stated the weapon utilized to kill Mr. Thompson was never recovered.

Dr. Robert Levine was questioned about the polymer plastic magazine recovered on July 23, 2011. He testified if the polymer plastic magazine had a number 31 and the letters RDS on it, this indicates it had capacity for 31 cartridges (bullets/rounds). He further stated, polymeric is a type of plastic material. Glock magazines have a plastic outer shell associated with them, so it is consistent with a Glock pistol. Dr. Levine testified the gun used in the shooting was probably a 40 caliber Glock. He further stated, based on his knowledge of the firing pin impression, the firing pin aperture marks, and the polygonal rifling, he would be shocked if any other manufacturer of a firearm was used in this incident (i.e. other than Glock). He concluded the polymeric magazine recovered could have been used to load the gun used in the shooting.

Trial Court Opinion, 7/23/13, 2-11.

Following Appellant's conviction and sentencing for first-degree murder and related charges, counsel for Appellant presented an oral post-sentence motion to set aside the jury's verdict. The trial court denied this motion on January 17, 2013. A timely notice of appeal ensued on February 15, 2013.

On February 20, 2013, the trial court directed Appellant to file a concise statement of error complained of on appeal pursuant to Pa.R.A.P. 1925(b). After requesting and receiving an extension of time, Appellant filed his concise statement on April 4, 2013. The trial court issued its opinion on July 23, 2013.

Appellant raises two claims for our review:

I. DID THE TRIAL COURT ABUSE ITS DISCRETION BY PERMITTING THE COMMONWEALTH TO PRESENT OTHER CRIMES EVIDENCE THAT APPROXIMATELY A MONTH AFTER THE HOMICIDE, [APPELLANT] POSSESSED A FIREARM THAT WAS NOT USED IN THE HOMICIDE AND HE MAY HAVE POSSESSED AN EXTENDED MAGAZINE THAT WAS NOT DEFINITIVELY CONNECTED TO THE HOMICIDE?

II. DID THE TRIAL COURT ABUSE ITS DISCRETION BY ADMITTING PREJUDICIAL HEARSAY TESTIMONY BY THE VICTIM'S GIRLFRIEND REGARDING STATEMENTS MADE BY THE VICTIM THAT IMPLICATED [APPELLANT]?

Appellant's Brief at 4.

In his first issue, Appellant claims that the trial court abused its discretion in admitting evidence pertaining to other crimes which showed that, approximately one month after the victim's shooting, Appellant discarded a loaded gun and an extended magazine during a police chase. Appellant argues that because the gun was not used in the shooting, and because it was not proven that the magazine was used in the shooting, this evidence was irrelevant and prejudicial and therefore should not have been admitted at trial.

We review Appellant's claim under a well-settled standard of review and firmly established principles:

> The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. **Commonwealth v. Reid**, 811 A.2d 530, 550 (Pa. 2002).
>
> According to Pa.R.E. 401, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
>
> Relevant evidence may nevertheless be excluded 'if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' [Pa.R.E. 403; **Commonwealth v. Kitchen**, 730 A.2d 513 (Pa. Super. 1999).]
>
> Because all relevant Commonwealth evidence is meant to prejudice a defendant, exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case. As this Court has noted, a trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts form part of the history and natural development of the events and offenses with which [a] defendant is charged. **Commonwealth v. Serge**, 837 A.2d 1255, 1260-[12]61 (Pa. Super. 2003).
>
> In addressing the admissibility of a gun for demonstrative purposes, the Pennsylvania Supreme Court has held that:
>
>> [a] weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime.

***Commonwealth v. Williams***, 640 A.2d 1251 (Pa. 1994). Similarly, in ***Commonwealth v. Shoatz***, 366 A.2d 1216 (Pa. 1976), the Pennsylvania Supreme Court stated that:

[A]t the time of his arrest approximately one and one-half years after the incident, appellant along with his companions were found to have possessed numerous advanced military weapons and munitions. These items included two of the United States Army's most advanced automatic rifles or machine guns, the M-16, plastic explosives manufactured solely for military use and other various military-type of ammunition. It is now contended that this evidence was irrelevant and served only to inflame and prejudice the jury since appellant was not being tried for the possession of this property.

* * *

Inasmuch as the instruments and devices found on appellant consisted of guns, ammunition and explosives, all of which corresponded generically and some of which corresponded exactly to the type of ammunition used in the homicide, it was relevant as a circumstance to help identify appellant and to help to connect him with the crime of which he was accused ...

***Shoatz***, 366 A.2d 1216, 1225-26.

***Commonwealth v. Broaster***, 863 A.2d 588, 591-593 (Pa. Super. 2004), *appeal denied*, 876 A.2d 392 (Pa. 2005).

Applying these principles in the case at bar, it is evident that Appellant is not entitled to relief on his opening claim. As the trial court observed, the discarded gun and magazines were relevant to connect Appellant with the crimes at issue because: (1) the Commonwealth's expert testified that the victim was shot with a handgun of the same caliber; and, (2) the recovered magazine housed the same number of rounds that would have been left

after a 15-round volley (the number of shell casings recovered at the crime scene one month earlier). Furthermore, no unfair prejudice emanated from the admission of this evidence since the trial court instructed the jury that the proof should be considered for identification purposes only and that the gun was not used to kill the victim. Since the trial court did not abuse its discretion in admitting this evidence, Appellant is not entitled to relief on his initial claim.

In his second claim, Appellant complains that the trial court erred and abused its discretion in admitting hearsay testimony offered by the victim's girlfriend. In developing this claim, Appellant points to testimony in which the victim's girlfriend relayed that the victim said that he had a dispute with Appellant which he (the victim) needed to address. Appellant argues that the Commonwealth improperly used the victim's statements to prove Appellant's state of mind and, therefore, the testimony was not admissible under the state of mind exception to the rule against hearsay. We conclude that this claim is meritless and that Appellant is not entitled to relief. In the alternative, even if Appellant established that admission of the challenged testimony violated the rule against hearsay, we find that this error was harmless.

> Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). Hearsay "is not admissible except as provided by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802. One of the more well-established exceptions to the

inadmissibility of hearsay evidence, commonly referred to as the 'state of mind' exception, is set forth among other hearsay exceptions in Pa.R.E. 803. Specifically, Rule 803(3) provides an exception to the hearsay rule for:

(3) Then–Existing Mental, Emotional, or Physical Condition. A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will. Pa.R.E. 803(3).

*Commonwealth v. Green*, 76 A.3d 575, 579 (Pa. Super. 2013), *appeal denied*, 87 A.3d 318 (Pa. 2014).

In this case, the trial court found that the challenged testimony related solely to the victim's understanding of the existence of a dispute with Appellant and the victim's intent to address that matter. **See** Trial Court Opinion, 7/23/13, at 22-25. Our review of the record confirms this assessment. Hence, we perceive no error or abuse of discretion in the trial court's admission of this evidence under Rule 803(3). Moreover, even if the trial court erred in admitting the challenged evidence under Rule 803(3), we conclude that any such error was harmless in view of the independent and compelling evidence of Appellant's guilt. **See Green**, 76 A.3d at 583 (finding that trial court abused its discretion in admitting hearsay statements from two witnesses under the state of mind exception but that error was harmless given other evidence of guilt); **Commonwealth v. Levanduski**, 907 A.2d 3, 22 (Pa. Super. 2006) (*en banc*) (finding victim's letter about

wife/defendant and her paramour inadmissible in murder trial under state-of-mind exception but that error was harmless in view of other overwhelming evidence), *appeal denied*, 919 A.2d 955 (Pa. 2007), *cert. denied*, 552 U.S. 823 (2007). Thus, no relief is due.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/23/2014