J-S49011-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ARTHUR BURTON SCHIRMER | |
| Appellant | No. 2644 EDA 2013 |

Appeal from the Judgment of Sentence March 18, 2013
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0002107-2010

BEFORE:  OLSON, OTT and STABILE, JJ.

MEMORANDUM BY OLSON, J.:                    **FILED DECEMBER 23, 2014**

Appellant, Arthur Burton Shirmer, appeals from the judgment of sentence entered on March 18, 2013, following his jury trial convictions for first-degree murder and tampering with physical evidence.[1]  After careful consideration, we affirm.

The esteemed trial court set forth the applicable factual and procedural history of this case as follows:

> […] Appellant was a pastor whose second wife, Betty Schirmer, appeared to have died in a car accident in [July,] 2008.  Following [the suicide of one of Appellant's parishioners, Joseph Musante, which occurred on or about October 29, 2008, more than three months after Betty's death], the car accident was investigated further.  The police came to believe that [] Appellant critically injured his

---

[1] 18 Pa.C.S.A. §§ 2502(a) and 4910, respectively.

wife and then staged a car crash to make her impending death appear to be an accident. [] Appellant's first wife, Jewel, also pre-deceased him after purportedly falling down the stairs in 1999.[fn] The circumstances of Jewel's death were admitted into evidence for limited purposes pursuant to Pa.R.E. 404(b).

\*          \*          \*

On November 15, 2010, the Commonwealth filed a criminal information.

On May 20, 2011, [] Appellant filed an omnibus motion [alleging, *inter alia*, that suppression was warranted based upon purported omissions and misstatements in the affidavits of probable cause attached to the search warrants that were issued].

On January 30, 2012, [the trial court] held the first omnibus hearing. On February 7, 2012, [the trial court] held the second omnibus hearing.

On March 19, 2012, [] Appellant filed a brief in support of his omnibus motion. On April 4, 2012, the Commonwealth filed a brief in opposition.

On May 18, 2012, [the trial court] entered an opinion and order denying [] Appellant's omnibus motion.

On June 1, 2012, [] Appellant filed four separate motions in limine challenging the admissibility of certain evidence on the basis of relevance, unfair prejudice, and improper character evidence.

On August 14, 2012, [] Appellant filed a brief in support of his motions in limine. On August 24, 2012, the Commonwealth filed a brief in opposition.

On November 16, 2012, [the trial court] entered an opinion and order denying [] Appellant's motions in limine.

On January 22, 2013, [following a ten-day trial,] the jury found [A]ppellant guilty of murder in the first degree and tampering with evidence.

On March 18, 2013, [the trial court] sentenced [] Appellant to life in prison without the possibility of parole for the first[-]degree murder conviction. [The trial court] also sentenced [] Appellant to three (3) to twenty-four (24) months in prison for the tampering with evidence conviction. On March 28, 2013, [] Appellant filed post-sentence motions. On April 22, 2013, [] Appellant filed a supplemental post-sentence motion and a brief in support. On May 3, 2013, the Commonwealth filed a brief in opposition.

On August 23, 2013, [the trial court] denied [] Appellant's post-sentence motions.

---

[fn] […] Appellant was not on trial for the murder of Jewel Schirmer. That alleged homicide occurred in Lebanon County and Lebanon County had charged but not yet prosecuted [] Appellant at the time of the instant murder trial.

Trial Court Opinion, 11/12/2013, at 1-3 (most footnotes and superfluous capitalization omitted). This timely appeal resulted.[2]

On appeal, Appellant presents the following issues for our review:

1. Should the Commonwealth be permitted to introduce irrelevant and presumptively prejudicial evidence that a defendant might have murdered his first wife ten years earlier to try to prove that he had now murdered his second wife, where the deaths were separated in time

---

[2] Appellant filed a notice of appeal on September 19, 2013. On September 20, 2013, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied timely. The trial court filed an opinion pursuant to Pa.R.A.P. 1925(a) on November 12, 2013, largely incorporating its prior opinions dated May 18, 2012 (denying Appellant's omnibus motion), November 16, 2012 (denying Appellant's motions *in limine*), and August 23, 2013 (denying Appellant's post-sentence motions).

and the circumstances surrounding the two deaths were different?

2. Where a man committed suicide after learning that his reverend was having an affair with that man's wife, can such evidence be admitted at the trial of that reverend for an unrelated murder when the sole basis for its admission is that the man's suicide sparked an investigation into the unrelated murder of the reverend's first and second wives?

3. Did the introduction of altered digital images of luminal glowing on a garage floor where the images never existed in real life and only tended to confuse and mislead the jury violate Pa.R.E. 403 and Pa.R.E. 901 in this close circumstantial evidence case?

4. Are a [d]efendant's [c]onstitutional [r]ights violated when he is denied the ability to present relevant testimony from a witness on his own behalf where that witness was the hair dresser who saw the alleged victim hours before her death and she would have testified that she cut the hair of the alleged victim who did not appear in distress or upset, and that it seemed to be a usual day for her?

5. Do misstatements and omissions of facts and undisclosed sources of expert opinion render a search warrant invalid where the statements are necessary to establish that a crime occurred and the police officer includes the statements despite having evidence suggesting otherwise?

Appellant's Brief at 5-6 (suggested answers omitted).

In his first issue presented, Appellant contends that the trial court erred by allowing the Commonwealth to present evidence, pursuant to Pa.R.E. 404(b), pertaining to the death of Appellant's first wife, Jewel, in 1999. *Id.* at 16. He claims:

The death of his first wife [, Jewel,] in 1999, had only been ruled a homicide as of 2012. However, the circumstances of [Jewel's] death were very different from the circumstances surrounding [, Betty's,] death. The Commonwealth maintained that the murder of [Jewel] was admissible because it went to prove [Appellant's] intent and it also rebutted [Appellant's] claim that [Betty] died in an accidental motor vehicle crash. The [Commonwealth's] introduction of evidence [relating to Jewel's] murder was not relevant to intent and had little if any probative value in rebutting the claim of accident; rather, it simply suggested that [Appellant] had killed before and would do it again.

*Id.* at 16. Appellant argues this matter is factually distinguishable from our Supreme Court's decision in *Commonwealth v. Boczkowski*, 846 A.2d 75 (Pa. 2004). Appellant's Brief at 16-27.

"On appeals challenging an evidentiary ruling of the trial court, our standard of review is limited." *Commonwealth v. Aikens*, 990 A.2d 1181, 1184 (Pa. Super. 2010) (citation omitted). "A trial court's decision will not be reversed absent a clear abuse of discretion." *Id.* "[An a]buse of discretion is not merely an error of judgment, but [occurs only] where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Id.* at 1184-1185.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "Evidence that is not relevant is not admissible." Pa.R.E. 402. Further, even if evidence is relevant, "[t]he court may exclude relevant evidence if its probative value is

outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

With regard to Pa.R.E. 404:

> Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa.R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact.

*Aikens*, 990 A.2d at 1185 (citation omitted).

In *Boczkowski*:

> Independent trial evidence established that [Boczkowski's] former wife, Elaine Boczkowski, had been found dead in her bathtub in Greensboro, North Carolina, on November 4, 1990. The factual circumstances of that death bore a marked similarity to the circumstances surrounding Maryann's [1994] death [in Ross Township, Pennsylvania]: Elaine died in her bathtub, Maryann in a hot tub. Both women were in their thirties and in good health. [Boczkowski] reported to the North Carolina police that Elaine had been drinking alcoholic beverages before entering the bathtub; he told Ross Township police that Maryann had been drinking prior to entering the hot tub. [Boczkowski] told police in both jurisdictions that he and his wife had a minor argument on the evening before the death. In each case, police noticed that [Boczkowski] had fresh scratch marks on his arms, hands and torso shortly after his wife's death. The autopsies of both women revealed that they had died from asphyxiation, not drowning.

- 6 -

*Commonwealth v. Boczkowski*, 846 A.2d 75, 82 (Pa. 2004).

The **Boczkowski** Court determined that evidence regarding Elaine's death was admissible in Maryann's murder trial, because:

> Given the remarkable similarity between the manner in which both of [Boczkowski's] wives were killed, evidence concerning the circumstances of Elaine's death supported a reasonable inference that Maryann's death was not accidental, but rather, was a result of [Boczkowski's] deliberate act. We agree with the Superior Court that the evidence was highly relevant and that its probative value outweighed any potential for unfair prejudice. As to the last point, we note that the trial court repeatedly and clearly charged the jury that the evidence was admitted for the limited purpose of excluding accident as the manner of death, and could not be considered for any other purpose. [**Commonwealth v.**] **Spotz**, 756 A.2d [1139,] 1153 [(Pa. 2000)](fact that trial court clearly instructed jury that it could only consider other crimes evidence for relevant limited purposes and not merely as evidence of appellant's propensity to commit crimes weighed against claim of error).

*Boczkowski*, 846 A.2d at 89.

We do not believe that the factual discrepancies between the murders in the present case, and those which occurred in **Boczkowski**, were so overwhelming as to preclude application of the rule followed by our Supreme Court in that case. Here, the trial court determined that the deaths of Jewel and Betty were substantially similar and that the probative value of evidence pertaining to Jewel's death outweighed its prejudicial effect. The trial court concluded that "[t]he evidence of the similarities between the cause of death in both cases – Jewel and Betty – could support a conclusion that Betty's death was not the result of an accident but was instead the intended

consequence of [Appellant's] behavior." Trial Court Opinion, 11/16/2012, at 5. The trial court further noted:

> Dr. Wayne Ross, a forensic pathologist reviewing the records of both Jewel Schirmer and Betty Schirmer, found that the damage to the scalp and skull showed remarkably similar patterns on both women. Dr. Ross opined that the evidence in both records was suggestive of staging. Both women lived for a short time after their respective "accidents" and died later at the hospital. [Appellant] was allegedly devoid of emotion at both accident scenes. There is some evidence of [Appellant] having extramarital affairs in both cases. In both instances [Appellant] is the only person known to have been with the victims prior to the accidents. Thus, if there [were] foul play in the deaths of the two women, [Appellant] would be the only logical suspect as no others were present. [Appellant] argues that Betty's death was accidental. The Commonwealth must prove that this is not true and that [Appellant] caused Betty's death. Evidence of a strikingly similar [prior] death is relevant evidence for the Commonwealth that the [present] death was not accidental, and was instead the intended consequence of [Appellant's] deliberate actions. […]
>
> [The trial court then] consider[ed] and balance[d] the competing interests at stake. The deaths of [Appellant's] two wives do bear many similarities[, h]owever, a significant amount of time did elapse between the two deaths. Additionally, the evidence of Jewel's death [is] extensive, and there is a definite concern that essentially a trial within a trial will result. This carries a danger of distracting or confusing the jury, a danger that [the trial court] carefully considered. Nevertheless, [the trial court found] that evidence of Jewel Schirmer's death [was] directly relevant, both as evidence of [Appellant's] intent and to rebut his claim that the death [of Betty] was accidental. The comparison of head injuries – one resulting from an alleged fall down the stairs, and the other from a car accident – is far more probative than an analysis of the head trauma experienced only by Betty Schirmer. While the

evidence is certainly prejudicial, [the trial court did] not find that the probative value [was] outweighed by the prejudice.

*Id.* at 5-6.

Upon review, we discern no abuse of discretion in admitting evidence of the death of Appellant's first wife, Jewel. Appellant claims his second wife's death was an accident. Pursuant to Pa.R.E. 404(b)(2), the Commonwealth was permitted to rebut that defense with evidence of Jewel Schmirer's death to show an absence of an or accident. We reject Appellant's contention that this case is factually distinct from **Boczkowski**. Here, Appellant claimed that both of his wives' deaths were accidental.[3] Despite the fact that the alleged accidents appeared to be distinct, both women had almost identical head wounds that suggested they had been bludgeoned with a long cylindrical object such as a crowbar before the staging of the alleged accidents. More specifically, Dr. Wayne Ross at trial opined:

> So the comparison is traumatic brain injury for both individuals, Jewel Schirmer, Betty Schirmer, multiple impacts to multiple sides of the head. Craniotomies are on the left side of the head, lacerations times two on the right side of the head. The lacerations look similar. The lacerations have similar orientation, going up and down. And the lacerations are compatible with impacts with a long cylindrical object, a crowbar, or other things.
>
> So, the comparison, what we call similarities, are extremely similar. And as a forensic pathologist, when

---

[3] Appellant claimed that Jewel died as a result of a fall down a set of stairs. He claimed that Betty died as a result of a motor vehicle accident.

- 9 -

we're drawing conclusions about reconstructing injuries and accidents, we look at the pattern of injuries. We look at the similarities. We look at the crime scene, and we try to piece it all together so we are able to draw conclusions about the cause of death, the manner of death, but also conclusions about the scenes.

N.T., 1/15/2013, at 90-91. The similarities in the manner of both women's deaths were evidence of lack of an accident. Moreover, like in **Boczkowski**, Appellant was the last person who was with the victims in both cases. The trial court carefully weighed the probative value of the evidence with the potential prejudice.

Additionally, the trial court issued cautionary instructions, immediately after testimony pertaining to Jewel Schirmer's death and during the official jury charge prior to deliberations. N.T., 1/15/2013, at 100-102; N.T., 1/22/2013, at 157-158. Those instructions specified that the jury was only to consider evidence of Jewel's death for the limited purpose of determining the absence of an accident, as mandated by Rule 404. "The jury is presumed to have followed the court's instructions." **Commonwealth v. Akbar**, 91 A.3d 227, 233-234 (Pa. Super. 2014). For all of the foregoing reasons, Appellant's first issue lacks merit.

In his second issue presented, Appellant claims the trial court erred by permitting the Commonwealth to enter evidence at trial regarding the suicide of Joseph Musante, one of Appellant's parishioners.[4] Appellant's Brief

_____

[4] Mr. Musante was the husband of Appellant's administrative assistant. N.T., 1/11/2013, at 120; N.T., 1/14/2013, at 115. Mr. Musante broke into

*(Footnote Continued Next Page)*

- 10 -

at 28. Appellant asserts that "the suicide as presented merely tended to establish that [Appellant] was a bad person and had contributed to the death of Joseph Musante" and "merely a guise for introducing irrelevant prior acts evidence in this case." *Id.* at 31. Appellant contends that the trial court agreed that evidence tending to show that Appellant caused the death of Mr. Musante would pose substantial prejudice, but then permitted the admission of five witnesses who testified about the suicide, "graphic photographic evidence" including a photo of Mr. Mustante's lifeless body seated behind Appellant's desk, a letter written by Mr. Musante's sister to church officials which "states that [Appellant] shares in responsibility for [Mr.] Mustante's death[.]" *Id.* at 33. Appellant argues "if police needed to describe why the investigation was reinitiated four months after the death of [Appellant's] second wife, the Commonwealth could have done so with far less detail then was admitted in this case." *Id.* at 34.

The Commonwealth proffered evidence pertaining to Mr. Musante's suicide as an effort to explain to the jury why the investigation into the death of Betty was reopened after its initial closure as an accident, and to offer the jury a complete story on the factual background of the instant offenses. Again, "[r]ulings on the admissibility of evidence are within the

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯

Appellant's office at the church and committed suicide while sitting at Appellant's desk. N.T., 1/11/2013 at 47-56. Mr. Musante believed that his wife and Appellant were having an affair. *Id.* at 120.

- 11 -

discretion of the trial judge, and such rulings form no basis for a grant of appellate relief absent an abuse of discretion." ***Commonwealth v. Green***, 76 A.3d 575, 583 (Pa. Super. 2013) (citation omitted). "While it is true that evidence of prior crimes and bad acts is generally inadmissible if offered for the sole purpose of demonstrating the defendant's bad character or criminal propensity, the same evidence may be admissible […] where the acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development." ***Id.*** "The ban on prior bad acts evidence, and the lion's share of associated exceptions … are set forth in Pa.R.E. 404(b)[,] however, [t]he *res gestae* or 'history of the case' exception, however, does not spring from Pa.R.E. 404." ***Id.*** Such exception is described as a:

> special circumstance, one where evidence of other crimes [or prior acts] may be relevant and admissible ... where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. This special circumstance, sometimes referred to as the "*res gestae*" exception to the general proscription against evidence of other crimes [or prior acts], is also known as the "complete story" rationale, *i.e.*, evidence of other [] acts is admissible "to complete the story of the crime on trial by proving its **immediate** context of happenings **near in time and place**."

***Id.*** at 583-584 (internal citations omitted; emphasis in original).

Here, the trial court determined:

> [E]vidence regarding the suicide of Joseph Musante and the affair between his wife and [Appellant] was relevant. … [The trial court] considered the evidence of the suicide

carefully. The suicide was a critical event in triggering the police investigation. In fact, due largely to [Appellant's] staging of the [car] accident [that Appellant claimed caused Betty's death], police did not initially conduct a thorough investigation of the car accident. The break-in at the church and suicide in [Appellant's] office were the events that caused police to take a second look at [the death of Appellant's] second wife, and ultimately triggered an investigation into the death of his first wife as well. Without evidence of the suicide, the Commonwealth's case would have been severely disadvantaged as the timeline would have been confusing. An unexplained gap in the timeline and investigative process would have had potential to confuse and distract the jurors. The Commonwealth did not indicate that [Appellant] caused the death of Joseph Musante nor did they argue that [Appellant's] "bad act" of engaging in an [] affair with Mr. Musante's wife meant that [Appellant] was a bad person and thus guilty of murder.

The testimony regarding the suicide was instead admitted to explain the course of events, particularly the course of investigation. The suicide and testimony from family members gave context for statements made by [Appellant] to church authorities during an investigation by church officials. [Appellant's] statements to Bishop [Peggy] Johnson that his wife's seatbelt had "come undone" at the moment of impact was used to explore the various different stories [Appellant] provided regarding the actual mechanics of the accident that he claimed caused [Betty's] death.

Absent any testimony regarding the suicide and related affair between [Appellant] and Mrs. Musante the trial would have consisted of testimony that was illogical and disconnected. Further, as [the trial court] stated in [its] November 16[, 2012] opinion:

> Additionally, evidence of the affair and suicide are not highly prejudicial. The suicide is temporally distinct from the alleged homicide. Evidence of it serves as explanation for the resurgence of investigation into Betty's death. It is not likely to confuse the jury and it is unlikely that the jury will be distracted from the task at hand – determining whether [Appellant] killed his wife – by evidence that

- 13 -

> Joseph [Musante] killed himself. There is no reason to conclude that the jury would be so inflamed by evidence of the suicide that they would determine [Appellant's] guilt on a basis other than the evidence relating to the death of his wife.
>
> **Similarly, while evidence of the affair may be prejudicial, this prejudice does not outweigh its probative value. Without evidence of the affair, the suicide is illogical, and without the suicide, the timeline of the investigation would appear completely baffling.** Such a logical gap would in fact be more likely to distract the jury from their careful consideration of the evidence of guilt or innocence than the evidence of the affair and suicide. Without this evidence, there are clear logical gaps in the Commonwealth's "story."

Trial Court Opinion, 8/23/2013, at 13-14 (emphasis added).

Here, the evidence of Mr. Musante's suicide was close in time and place to the criminal investigation surrounding Betty's death and necessary to complete the whole story as to why her death was deemed an accident originally, but was subsequently reopened. The investigation was complicated, made difficult by the fact that Betty's death appeared staged, and involved multiple authorities from both the church and police departments. Throughout the investigation, Appellant gave conflicting stories to church officials and the police that formed the basis for the natural progression of the investigation. Thus, evidence of the suicide was clearly relevant to complete the story regarding the charged offenses. Moreover, the suicide was completely distinct from Appellant's charged crimes and the minimal likelihood of the jury convicting him on such evidence was

outweighed by the probative value of evidence of the suicide. Furthermore, upon independent review, the Commonwealth did not inappropriately argue that Appellant caused Mr. Musante's death or that causing someone to commit suicide was consistent with the murder of Appellant's second wife. The evidence was tailored to the investigation and formed part of the chain or sequence of events which became part of the history of the case. As such, we discern no abuse of discretion or error of law by the trial court in admitting evidence of Mr. Musante's suicide.[5] Thus, Appellant's second issue is meritless.

_____

[5] We briefly address Appellant's alternative assertion that the prejudice of the cumulative evidence of Mr. Musante's death outweighed its probative value. Appellant claims that it was improper for the trial court to have permitted the Commonwealth to admit into evidence a photo of Mr. Mustante's lifeless body seated behind Appellant's desk, a letter written by Mr. Musante's sister to church officials, and the testimony of five witnesses. Appellant's Brief at 33.

Initially, we note that the photograph and the letter to church officials are not contained in the certified record. The certified record consists of the "original papers and exhibits filed in the lower court, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the lower court." Pa.R.A.P.1921. "Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty." *Commonwealth v. Preston*, 904 A.2d 1, 7 (Pa. Super. 2006). "[A]ny document which is not part of the officially certified record is deemed non-existent—a deficiency which cannot be remedied merely by including copies of the missing documents in a brief or in the reproduced record." *Id.* at 6. "Simply put, if a document [or photograph] is not in the certified record, the Superior Court may not consider it." *Id.* at 7. Thus, due to the failure to include the exhibits in the certified record, we are unable to review them and, therefore,
*(Footnote Continued Next Page)*

In his third issue presented, Appellant claims that the trial court erred by allowing "digitally altered images" depicting luminol testing[6] because the admitted photographs[7] were "fabricated" and made "the garage floor look like it was covered in blood." Appellant's Brief at 35. More specifically, he argues that "[t]hese digitally altered images were not fair and accurate depictions of how the lumin[o]l looked on the garage floor, and the alterations to the photographs were never noted by the State Police and therefore the process and system used to create them could not even be described at trial." *Id.* at 36. Thus, he contends that "the introduction of

_(Footnote Continued)_ _____

may not consider whether evidence of the photograph and letter to church officials in relation to Mr. Musante's death was unduly prejudicial.

Regarding Appellant's claim that the Commonwealth unnecessarily presented five witnesses to testify about the suicide, we conclude that the trial court did not abuse its discretion in permitting such testimony. Upon review, no one witness was able to explain the affair and subsequent suicide in the context of both the church and police investigations. As previously stated, this was a complex matter made difficult by staging the death to look like an accident. Based upon our standard of review, we conclude that the trial court properly weighed the prejudicial nature of the aforementioned evidence with its probative value and we discern no abuse of discretion in its admission at trial.

[6] Luminol is a chemical that illuminates when it contacts the iron component of blood. *Commonwealth v. Williams*, 854 A.2d 440, 443 (Pa. 2004).

[7] Again, the actual photographs of the luminol testing are not contained in the certified record and we may not consider them. *See* Pa.R.A.P.1921; *Preston*, 904 A.2d at 7. However, we are able to reach the merits of Appellant's argument based upon our review of the witness testimony pertaining to luminol photography as presented at trial.

those images only tended to confuse and mislead [the] jury[.]" *Id.* at 35-36.

Our standard of review is as follows:

> Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. The requirement of authentication or identification is codified at Pennsylvania Rule of Evidence 901, 42 Pa.C.S.A.: "(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Pa.R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be may be sufficient to authenticate or identify the evidence. Pa.R.E. 901(b)(1).
>
> Abuse of discretion is shown in the record where the court does not apply the law in reaching judgment, or exercises manifestly unreasonable judgment, or judgment that is the result of partiality, prejudice, bias, or ill will.

*Commonwealth v. Mitchell*, 883 A.2d 1096, 1109-1110 (Pa. Super. 2005) (internal citations omitted).

On the issue of the photographs depicting luminol testing, the trial court herein determined:

> At trial, the Commonwealth submitted various images of the blood which luminesced in the garage of [] Appellant's parsonage. What [] Appellant pervasively phrases as "computer generated images" are, in fact, the overlaid photographs of the garage when it was lit and the garage when it was dark. The photograph overlay process occurs thus: A camera is placed in a certain position and takes a photograph while the room's lights are on; without moving the camera, the photographer then takes another photograph when the room's lights are off. The photograph of the luminescing blood is then overlaid onto the photograph of the lit room. Luminol photography must be

- 17 -

conducted in almost complete darkness in order to view the luminescence. Considering the dark background of the luminesced photograph, the photographs were combined into a single image in order to show the location of the blood in the garage. The blood's location would, otherwise, be very difficult for the jury to determine. Adobe Photoshop was employed in order to combine the photographs.

Trial Court Opinion, 11/12/2013, at 5.

Upon review of the record, we conclude that Appellant is not entitled to relief. The Commonwealth presented the testimony of Pennsylvania State Police Trooper John Corrigan, who the trial court accepted as "an expert in crime scene processing, evidence collection, enhancement techniques, including the use of luminol." N.T., 1/9/2013, at 70. Before admitting photographs of the luminol testing, Trooper Corrigan identified them and stated that the photographs fairly and accurately depicted the luminol testing process. *Id.* at 94. "Luminol is an enhancement or a detection of blood" that is "mostly used at crime scenes for blood that's not visible to the naked eye or from blood that's already been cleaned up." *Id.* at 95. Police conduct testing in the dark, because they spray luminol onto an area of the search and a chemical reaction creates a blue glow that indicates a reaction to blood. *Id.* at 96. Trooper Corrigan applied luminol to Appellant's garage and took a photograph in complete darkness of areas that were luminescing. *Id.* at 96-98. He then took a flash photograph from the identical location to show the affected area in the light. *Id.* at 98-99. The photographs were properly authenticated and accurately showed the garage in the light and dark.

Utilizing computer technology, Trooper Corrigan then overlaid the two photographs to show the relationship between the glowing luminol and the physical layout of the garage. *Id.* at 99-103. Trooper Corrigan testified that he layers the photographs on top of one another because

> if [he] show[ed] you a true luminol photograph you're going to see little blue specs, and you're not going to see anything else in relationship to those blue specs, so it's not going to be of any value. It could be in the middle of [his] living room. It could be in the middle of your living room. You're not going to know where it's taken.

*Id.* at 98-99. Based upon the foregoing, the trial court properly weighed the probative value of the photographs with the potential prejudice. In fact, showing the jury the original photographs, but not the single overlaid photograph, would be potentially more confusing and misleading to them. Thus, Appellant's third issue lacks merit.

In his fourth issue presented, Appellant claims that the trial court erred in precluding him from calling Jewel Schirmer's hairdresser as a witness at trial. Appellant's Brief at 44. Appellant asserts that the hairdresser was prepared to testify that Jewel had an early morning hair appointment on the day of her death and there was nothing "out of the ordinary that day." *Id.* at 45. Appellant argues that the "appointment itself was relevant because it would have made it less likely for [Jewel] to have showered on the morning of her death." *Id.* Appellant proffered this testimony to refute Commonwealth witness, Dr. Wayne Ross' opinion "that he could not rule out forceful penetration of the rectal area of [Jewel]." *Id.*

Thus, Appellant contends that the hairdresser's testimony was offered to provide the jury with the inference that "the presence of semen near [Jewel's] anus could be explained from sex occurring the night before that remained near that portion of her body." *Id.*

The trial court precluded the proffered testimony as irrelevant. Trial Court Opinion, 11/12/2013, at 6. Citing Pa.R.E. 401, the trial court noted that "Appellant was not on trial for the murder of Jewel" and the proffered testimony that there was nothing unusual about Jewel's behavior on the day of the murder "had no tendency to make a material fact in the homicide of Betty Schirmer more or less likely." *Id.* at 6-7.

Based upon our standard of review regarding the admissibility of evidence, we conclude that the trial court did not abuse its discretion by precluding the proffered testimony. Appellant claims that the witness would have testified that there was nothing unusual on the day of Jewel's death. The submitted evidence was entirely tangential to the death of Betty Schirmer. Moreover, the inferences to be drawn were speculative, at best, because the hairdresser did not have first-hand knowledge of Jewel's sexual activity or hygiene on the day in question. Accordingly, we agree that the proffered testimony was irrelevant to the current matter and the trial court properly precluded it from trial pursuant to Pa.R.E. 402. Accordingly, Appellant's fourth issue is without merit.

Finally, Appellant argues that the search warrants obtained in this case[8] were based upon misstatements, omissions of fact, and unsupported expert conclusions and, thus, the trial court erred by failing to suppress the physical evidence recovered by police upon execution of those warrants. Appellant's Brief at 46-52. Appellant points to three specific statements, as set forth in the affidavits of probable cause, which he believes contained misstatements or omissions. First, Appellant contends that the affidavits omitted certain circumstances related to the death of his first wife, Jewel. Specifically, Appellant argues that the affiant "deliberately omitted from the affidavit of probable cause certain circumstances surrounding the death of [Jewel] that a reasonable person would want to know." *Id.* at 50. Appellant goes on to state that at the time the affidavits were signed, the affiant had records from Lebanon County "where EMT's stated that it appeared [Jewel] had fallen straight back from the top of the stairs" and "information that [Jewel]… died of a heart attack." *Id.* Appellant further claims that the affidavits omitted any reference to the findings of Dr. Isadore Mihalakis that

---

[8] There were seven search warrants issued in this case, all utilizing substantially similar affidavits of probable cause. Trial Court Opinion, 5/18/2012, at 13. The warrants were issued for the parsonage and garage at the United Methodist Church in Reeders, Pennsylvania, the 2007 PT Cruiser involved in the motor vehicle crash, and Appellant's residence. Moreover, the warrants authorized the search and seizure of computers and electronic devices found at the United Methodist Church and in the 2007 PT Cruiser. Finally, police obtained a search warrant to draw Appellant's blood for DNA purposes. *Id.*

Betty's death may or may not be consistent with a motor vehicle accident, or Dr. Mihalakis' written report that concluded that Betty's injuries were, in fact, consistent with a motor vehicle accident. *Id.* at 50-51. Finally, Appellant argues that because "it was not mentioned in the warrant [that the affiant] had any training in blood splatter analysis" and the affidavit of probable cause "does not state any source for [the affiant's] conclusions that a low speed accident could not cause the injuries suffered by [Appellant's] second wife, the conclusions he writes are themselves misstatements." *Id.* at 51.

Our standard of review in addressing a challenge to the denial of a suppression motion is

> limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.
>
> Moreover, it is within the suppression court's sole province as fact finder to pass on the credibility of witnesses and the weight to be given their testimony.

*Commonwealth v. Baker*, 24 A.3d 1006, 1015 (Pa. Super. 2011) (internal citations, quotations and brackets omitted).

"Search warrants must be supported by probable cause." *Commonwealth v. Johnson*, 42 A.3d 1017, 1031 (Pa. 2012) (citation omitted). "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." *Id.* In order to secure a valid search warrant,

> an affiant must provide a magistrate with information sufficient to persuade a reasonable person that there is probable cause for a search. The information must give the magistrate the opportunity to know and weigh the facts and to determine objectively whether there is a need to invade a person's privacy to enforce the law.
>
> In determining whether a search warrant is based upon probable cause, [the United States Supreme Court has stated]:
>
> > The Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by the nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police

officers from submitting their evidence to a judicial officer before acting.

***Baker***, 24 A.3d at 1017(citations and quotations omitted).

Regarding misstatements in affidavits of probable cause, since 1970 Pennsylvania courts have consistently found:

> misstatements of fact will invalidate a search warrant and require suppression of the fruits of the search **only if the misstatements of fact are deliberate and material**.

> While we have recognized that the veracity of facts establishing probable cause recited in an affidavit supporting a search warrant may be challenged and examined, [our courts] have not suggested that every inaccuracy will justify an exclusion of evidence obtained as a result of the search. The question of whether a misstatement was deliberately made is to be answered by the lower court.

***Id.*** at 1017 (emphasis in original). Moreover, this Court has concluded a misstatement is immaterial "if an independent basis exists to support a finding of probable cause." ***Commonwealth v. Antoszyk***, 985 A.2d 975, 982 (Pa. Super. 2009).

Where omissions are the basis for a challenge to an affidavit of probable cause supporting a warrant, we apply the following test:

> (1) whether the officer withheld a highly relevant fact within his knowledge, where "any reasonable person would have known that this was the kind of thing the judge would wish to know"; and (2) whether the affidavit would have provided probable cause if it had contained a disclosure of the omitted information.

***Commonwealth v. Taylor***, 850 A.2d 684, 689 (Pa. Super. 2004).

Here, based upon our standard of review, we discern no abuse of discretion or error of law in denying suppression. The trial court set forth the applicable legal principles, scrutinized the affidavits of probable cause at issue, and thoughtfully examined the testimony of the investigating officers and affiant to conclude that there were no material misstatements or omissions. Trial Court Opinion, 5/18/2012, at 13-23. We agree.

With regard to Appellant's first allegation of error that "it was a misstatement to discuss the death of [Appellant's] first wife without mentioning a conclusion referenced in a Lebanon County [p]olice report that indicated Jewel Schirmer suffered a myocardial infarction[,]" the trial court determined:

> Detective [James] Wagner and Trooper [William] Maynard both made clear at the time of the omnibus hearing that there were no medical records to sustain a conclusion that Jewel died of a heart attack. [Trooper] Maynard and [Detective] Wagner were clear that they did not rely on information contained in the Lebanon County [p]olice report; but rather based their information and conclusions on the coroner's report. They did not have medical records in their possession at the time the warrants were issued. The only clear misstatement in the affidavits regarding Jewel's death was the statement that her manner of death was determined to be accidental. In reality, the manner of death remained "undetermined" at the time the affidavits were written and sworn to.
>
> Once again, probable cause is present where "the facts and circumstances within the affiant's knowledge and of which he has reasonable trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." *Commonwealth v. Thomas*, 292 A.2d 352, 357 (Pa. 1972). It is manifestly reasonable to rely on the coroner's report

- 25 -

which was received from Dr. Wayne Ross, rather than another county's police records. At the time the affidavits were written, the only indication of a myocardial infarction was contained in the Lebanon County police report. This resulted from Chief Deputy Coroner Patty Garber indicating to the police that Kidney One and Hershey Medical Center had indicated to her that the heart was damaged. However, Dr. Ross had never received records from Kidney One or Hershey Medical Center to support that determination.

An assertion in a police report that someone else had heard from yet a third party that there was a problem with the heart is unreliable information in comparison to the coroner's report. The affidavit merely characterized the death of Jewel Schirmer as "suspicious." The affidavit did mischaracterize the status of her death by relating that the manner of death was determined to be accidental. Excising the statement that manner of death was accidental strengthens the conclusion that the death of [Jewel] was suspicious.

The omission of any mention of a myocardial infarction with respect to Jewel's heart was not a highly relevant fact. However, even if this [were] a highly relevant fact, probable cause would still exist with the disclosure of the omitted information.

*Id.* at 22.

Regarding Appellant's contention that the affiant omitted an expert report prepared by Dr. Mihalakis,[9] the trial court found credible the affiant's

_____

[9] Specifically, Appellant challenges the statement in the affidavit that "Betty Schirmer's body could not have slammed around inside the car from the impact with the guardrail… Betty Schirmers [sic] injuries are consistent with an assault or beating with a blunt force object or weapon." Trial Court Opinion, 5/18/2012, at 17. Appellant argues that this is a misstatement because it does not reference Dr. Mihalakis' written report that stated that Betty's injuries were consistent with an automobile accident in which the victim was an unrestrained passenger.
*(Footnote Continued Next Page)*

testimony that he did not review the report prior to applying for the search warrants and that he had only been told that the injuries could have been consistent with an automobile accident, but may have been inflicted prior. [10] *Id.* at 19. Moreover, even though Dr. Mihalakis' written report was not referenced in the affidavit, the trial court found that the omission of any reference in the affidavit to Dr. Mihalakis' report was not relevant as the report contained numerous factual inaccuracies. *Id.* at 18. Finally, the trial court concluded that the affidavit had sufficient independent bases to establish probable cause that Betty's injuries were inconsistent with the vehicular accident, stating:

> [T]he affidavit would still allege that there was no evidence of braking or skid marks, and that the damage to the vehicle was very minor. Examination of the blood evidence indicated that the victim was bleeding prior to the accident. [Appellant] gave contradictory statements to the deputy coroner and to the police. The death of [Appellant's] first wife was suspicious.

*Id.* at 20.

*(Footnote Continued)* _____

[10] The affiant, James Wagner, a detective with the Pocono Township Police department was investigating the case and working in conjunction with Tom McAndrew, an officer with the Pennsylvania State Police. N.T., 1/30/2012, at 62-68. Trooper McAndrew met with Dr. Mihalakis to examine the blood evidence. *Id.* at 68. Trooper McAndrew relayed Dr. Mihalakis' initial findings to Detective Wagner, but Detective Wagner did not see Dr. Mihalakis' formal report until after the searches were conducted. *Id.* at 69. At the time he submitted applications for the search warrants, Detective Wagner testified that, "[a]ll [he] knew at that time was Trooper McAndrew told [him] that the injury to Betty's head was what [Dr. Mihalakis] would expect to find or see in a [vehicular] crash." *Id.* at 69.

Finally, pertaining to Appellant's claim that the affiant lacked expertise in rendering a conclusion that a low speed accident could not cause the injuries suffered by the victim, the trial court concluded: (1) the affiant testified previously in the Commonwealth as an expert in blood spatter analysis; (2) prior to applying for a search warrant, the affiant consulted with another investigating officer who was qualified as an expert in "blood stain analysis and crime scene processing[;]" and, (3) an expert from New York concurred that the victim was bleeding prior to entering the car before the search warrants were issued. *Id.* at 21. Accordingly, the trial court found that "the conclusions of a township detective with training in the field of blood stain analysis and a state trooper qualified as an expert in blood stain analysis, together with the concurrence of another expert in the field is enough to support the statement about the victim bleeding prior to the accident." *Id.* at 21-22.

We discern no abuse of discretion or error of law with respect to any of the conclusions reached by the able trial court in denying Appellant's motion to suppress based on the affidavits of probable cause issued in support of the search warrants. The affidavits of probable cause were accurate reflections of the knowledge known to the affiant at the time of the applications. There was no deliberate withholding of information and there were no material misstatements in the affidavits of probable cause. Moreover, there were sufficient independent bases within the affidavits of

probable cause to support the issuance of search warrants in this case.

Accordingly, Appellant's final issue does not merit relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/23/2014