J-A31020-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MATTHEW SCOTT BECKER | |
| Appellant | No. 1801 MDA 2013 |

Appeal from the Judgment of Sentence March 28, 2013
In the Court of Common Pleas of Lancaster County
Criminal Division at No(s): CP-36-CR-0004681-2011

BEFORE:  BOWES, J., OTT, J., and STABILE, J.

MEMORANDUM BY OTT, J.:                    **FILED MARCH 11, 2015**

Matthew Scott Becker appeals from the judgment of sentence imposed on March 28, 2013, in the Court of Common Pleas of Lancaster County. On March 13, 2013, a jury found Becker guilty of murder in the first degree, and third degree murder of an unborn child.[1] The trial court sentenced Becker to a term of life imprisonment, and a consecutive term of 20 to 40 years' imprisonment, after the jury was unable to agree whether to impose a sentence of death or life imprisonment. Becker raises seven issues, challenging (1) the admission of evidence pursuant to Pennsylvania Rule of Evidence 404(b), (2) the admission of evidence of a statement Becker made to police on August 18, 2011, (3) the preclusion of certain evidence

_____

[1] **See** 18 Pa.C.S. §§ 2501(a)(1), and 2603(a), respectively.

proffered by Becker's firearms expert, (4) the admission of evidence related to Becker's mental health, (5) the denial of his motion for mistrial based upon prosecutorial misconduct, (6) the sufficiency of the evidence, and (7) the weight of the evidence. Based upon the following, we affirm.

The charges against Becker arose from the fatal shooting of Allison Walsh, on August 12, 2011, at approximately 11:00 p.m. Walsh, who was Becker's girlfriend and was living with him, was seven months pregnant. Walsh's unborn child also died as a result of the shooting. Becker maintained he was in the process of cleaning the firearm when the gun accidentally discharged and killed the victims. The Commonwealth's theory of the case was that Becker intentionally shot Allison Walsh with the specific intent to kill her.

At the outset, we state that we will address Becker's first issue only. With regard to issues two through seven, we adopt the trial court's thorough and well-reasoned opinion as our own for purposes of further appellate review. *See* Trial Court Opinions, 01/11/2013 & 12/26/2013.

In his first issue, Becker claims the trial court erred in permitting the Commonwealth to present evidence pursuant to Pennsylvania Rule of Evidence 404(b).[2] Specifically, Becker challenges the testimony of four

---

[2] At the time of Becker's trial, Rule 404 provided, in relevant part:

(1) Evidence of other crimes, wrongs, or acts is not admissible to
*(Footnote Continued Next Page)*

witnesses, Danielle Detweiler, Devon Detweiler, Gregory Miller, and Megan Walsh.

In reviewing the court's evidentiary rulings that permitted the afore-mentioned testimony, our standard of review is well settled:

> A trial court's decision to allow the admission of evidence is a matter within its sound discretion, and we will reverse that decision only when it has been shown that the trial court abused that discretion.

***Commonwealth v. Briggs***, 12 A.3d 291, 336 (Pa. 2011) (citation omitted), *cert. denied,* 132 S. Ct. 267 (2011).

We first address the testimony of the Detweiler sisters, admitted pursuant to Rule 404(b). Danielle Detweiler was a former girlfriend of Becker. Devon Detwiller is Danielle's sister. Danielle testified she and Becker dated for a little over a year in 2007–2008, and their relationship ended in June of 2008. N.T., 3/7/2013, at 2341, 2356–2357. Danielle

*(Footnote Continued)* —————————

> prove the character of a person in order to show action in conformity therewith.
>
> (2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
>
> (3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

Pa.R.E. Rule 404(b)(1)-(3). We note Rule 404 was rescinded and replaced, effective March 18, 2013.

testified Becker pointed a handgun at her "that he said was his grandpa's [a]nd he said it didn't work[.]" *Id.* at 2343. She stated he pointed this handgun at her on "a few" occasions, and that "[t]he first time it was, like, joking around. And then the other times he would get erratic and angry." *Id.* at 2344. Danielle stated that Becker also had several Airsoft/BB guns and that he would shoot her with them if he got mad. *Id.* Danielle testified Becker shot her with the pellet guns more than ten times. She stated the pellet guns hurt and left welts. She admitted the Airsoft gun was a toy sold in stores such as Walmart and Kmart. *Id.* at 2352–2353. Danielle's sister, Devon, testified that she saw Becker shoot Danielle with the Airsoft/BB pellet guns "a couple of times when he was actually angry with her" and she "would see bruises." *Id.* at 2364, 2366.

Becker argues that "it was error to allow such testimony in light of the time frame between the acts and the crime for which [Becker] was on trial; the distinction between the acts and the crime for which [Becker] was on trial; and the absence of evidence supporting the claim that the evidence was relevant on motive, intent or lack of mistake." Becker's Brief, at 22.

Regarding remoteness, the Pennsylvania Supreme Court "has indicated that this generally affects the weight — but not the admissibility — of the evidence; further, the Court has emphasized the deference due to the trial court in the exercise of its discretion." *Commonwealth v. Reed*, 990 A.2d 1158, 1168 (Pa. 2010), *cert. denied*, 562 U.S. 1020 (2010). Moreover, "the importance of the time period is inversely proportional to the similarity of

the crimes in question." ***Commonwealth v. Miller,*** 664 A.2d 1310, 1319 (Pa. 1995), *cert. denied*, 516 U.S. 1122 (1996). Remoteness in time has been generally construed to be ". . . another factor to be considered in determining whether a prior incident . . . [of abuse] tends to show that a second incident . . . [of abuse] was an accident." ***Commonwealth v. Donahue,*** 549 A.2d 121, 127–128 (Pa. 1988) (*plurality*) (finding three years was not unduly remote). Furthermore, regarding probative value, this Court, in ***Commonwealth v. Green***, 76 A.3d 575 (Pa. Super. 2013), *appeal denied*, 87 A.3d 318 (Pa. 2014), held that evidence that the defendant pointed a gun at the victim's head "in mere play" two months before the murder was probative of motive or absence of mistake, justifying its admission under Pa.R.E. 404(b)(2). ***Id.*** at 585.[3] The ***Green*** Court stated:

---

[3] In ***Green***, the trial court admitted the following evidence of the appellant's prior bad acts:

> Janai Curry testified regarding an incident she witnessed that occurred two or three months before the shooting. N.T., 9/19-20/11, at 109. Curry recounted that she and the Victim were preparing to go out to a club. ***Id.*** The Victim was in the bathroom fixing her hair when Appellant entered with a gun and said "where the F are you going[?]" ***Id.*** Appellant pointed the gun at the Victim when he made the statement. ***Id.*** at 110. Although Curry described the event as Appellant "playing with her," she also said that it made the Victim "upset because she felt like why are you playing with a gun, and why you [sic] point it at my face?" ***Id.***

76 A.3d at 583 (footnote omitted).

"Taken as evidence of mistake or accident, the gun-pointing incident was highly relevant to the degree of guilt at issue in this case, which ran the gamut from first-degree murder to involuntary manslaughter." *Id.*

The trial court explained its ruling regarding admission of the testimony of the Detweiler sisters, in part, as follows:

> Here, although approximately three (3) years had elapsed between the acts testified to by the Detweilers and the crime for which Becker was on trial, the time between the incidents is not highly probative as to Becker's intent. There is, however, a strong similarity in the circumstances surrounding these prior incidents and the crime for which Becker was on trial. The Detweilers' testimony involved Becker's prior threats relating to guns or firearms and the use thereof, and Becker was on trial for the shooting death of Walsh. Finally, evidence of the prior violent acts is necessary to rebut the accused's evidence or contention of accident, mistake or lack of required intent. The Detweilers' testimony made it more probable that Becker shot Walsh intentionally, and less probable that the shooting was accidental. This satisfies the requirement that the evidence be introduced for some legitimate purpose and not merely to prejudice Becker by showing him to be a person of bad character. …

Trial Court Opinion, 12/26/2013, at 4-5.

Applying the above-stated legal principles, we find no abuse of discretion. While the Detweilers' testimony concerned Becker's use of a supposedly inoperable gun or an Airsoft gun in his relationship with Danielle three years earlier, we agree with the trial court that Becker's prior gun-pointing behavior was not unduly remote and was probative to the issue of accident or mistake and degree of guilt in this case. *See Donahue, supra; Green, supra.* Accordingly, no relief is due on this claim.

Next, Becker contends that trial court erred in admitting the testimony of the Commonwealth's witness, Gregory Miller. Gregory Miller testified that he was a friend of Becker's and that he had observed Becker act in a verbally abusive way towards the victim in 2011. He testified: "[H]e referred to her regularly as a bitch, a slut, a whore, and on more than one occasion, stronger terms like a cunt or a nigger." *Id.* at 2385. Miller also stated Becker "would frequently remind [the victim] that he had firearms and ammunition when he was angry with her." *Id.* at 2386. Miller recalled that Becker "threaten[ed] to pistol whip [the victim] on one occasion," *id.*, and would "raise[] his hand … as if he was going to backhand her or occasionally closed fist pulled back[.]". *Id.* at 2405.

Becker argues, first, that the evidence was admitted in violation of Rule 404(b)(3), which provides that prior bad acts evidence may only be admitted "upon a showing that the probative value of the evidence outweighs its potential for prejudice." Pa.R.E. 404(b)(3). Becker's argument, however, ignores the defense theory that the shooting was accidental, as well as the defense's reliance on statements made by Becker during police interviews regarding his love for the victim and the unborn child.[4] Therefore, we find that Miller's testimony that he had seen Becker

---

[4] *See e.g.*, N.T., 3/4/2013, at 1585–1586 (trial counsel's opening statement). *See also*, N.T., 3/7/2013, at 2545–2547, 2558, 2572–2573, 2587 (cross examination of Corporal Robert Courtright).

act abusively toward the victim in 2011 was relevant to rebut the defense's characterization of the relationship and the shooting.

Likewise, we find no merit in Becker's argument that the Court erred in admitting the testimony of Miller because the Commonwealth failed to provide any notice of its intention to introduce such evidence prior to trial. Rule 404(b)(3) provides: "In a criminal case the prosecutor must provide reasonable notice in advance of trial, **_or during trial if the court excuses pretrial notice on good cause shown_**, of the general nature of any such evidence the prosecutor intends to introduce at trial." Pa.R.E. 404(b)(3) (emphasis added). Therefore, the Rule allows the court to excuse pretrial notice for "good cause."

Here, the Commonwealth filed its "Second Supplemental Notice of Intention to Introduce Evidence of Other Crimes, Wrongs or Acts Pursuant to Pennsylvania Rule of Evidence 404(b)," on the morning of February 28, 2013, averring that Miller had initiated contact with the Commonwealth on February 25, 2013, the day jury selection commenced, and was interviewed by State Police during the evening hours of February 27, 2013. The trial court, on March 4, 2013, entered an order finding Miller's testimony admissible as stated in the order. It is therefore clear that the trial court excused pretrial notice to the defense based upon the late date the Commonwealth received the evidence. We agree that this is "good cause." Accordingly, no relief is due on this claim.

Lastly, Becker contends that the content of Miller's testimony "violated [his] Due Process Rights by forcing him to proceed to trial with a jury that was selected without knowledge of Miller's testimony and without the opportunity to *voir dire* potential jurors about the content of Miller's testimony, specifically, the allegations of racial bigotry." Becker's Brief, at 29. Becker argues that "[a]lthough both victim and [Becker] were white, the use of the word 'nigger' attributed to [Becker] by the witness served no evidentiary purpose but likely prejudiced the jury against [Becker] impermissibly." *Id.* at 28. Becker contends the derogatory word was particularly egregious in light of the fact that the jury contained an African American woman. Becker further contends the Commonwealth exploited this testimony when the prosecutor asked a follow up question. This argument is unavailing.

At trial, prior to Miller's testimony, the Commonwealth's attorney advised the trial court that Miller had been instructed that "[u]sing any racial pejoratives is out." N.T., 3/7/2013, at 2337. Nevertheless, Miller used the epithet in his testimony in relating Becker's verbal abuse of the victim. Becker now attempts to use Miller's unanticipated trial testimony to challenge the court's pre-trial Rule 404(b) order. The trial court, rejecting this claim, reasoning:

> Any reasonable juror would understand that Becker's use of the word "nigger" was not racially motivated, based on the circumstances of this particular case. Also, as discussed above, the Commonwealth's other witnesses testified to instances in which Becker engaged in acts of domestic violence. Therefore,

this Court finds that the evidence elicited from Miller's testimony did not violate Becker's Due Process Rights.

Trial Court Opinion, 12/26/2013, at 9.

It merits emphasis that there was no objection, nor motion for mistrial when Miller used the epithet in his testimony, or when the Commonwealth's attorney asked a follow up question. Furthermore, counsel could have, but did not, request to *voir dire* the jurors. Therefore, Becker's argument concerning the effect of the word upon the jurors is speculation at this juncture. As such, no relief is due on this claim.

Finally, Becker's challenges the testimony of Megan Walsh, the victim's sister. Specifically, Megan Walsh was permitted to testify regarding a July 21, 2011, Facebook conversation that occurred between her and the victim, as follows:

> Allison Walsh: I am SO (sic) tempted to just pack all my shit up but I'm deathly afraid of his reaction.
>
> Megan Walsh: what would he do?
>
> Allison Walsh: probably flip out and pull a gun on me knowing him

Commonwealth Exhibit 33; N.T., 3/7/2013, at 2377–2379.[5]

---

[5] The Commonwealth sought admission of this testimony pursuant to Pa.R.E. 404(b)(2) (motive, intent, and absence of mistake or accident) and Pa.R.E. 803(3) ("Then Existing Mental, Emotional or Physical Condition"). **See** Commonwealth's Notice of Intention to Introduce Evidence of Other Crimes, Wrongs or Acts Pursuant to Pennsylvania Rule of Evidence 404(b), 6/15/2012, at ¶¶39–41.

At the outset, we note hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). Hearsay "is not admissible except as provided by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802.

At the time of Becker's trial, Pa.R.E. 803(3) read as follows:

> The following statements, as hereinafter defined, are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> ****
>
> **(3) Then existing mental, emotional, or physical condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health. A statement of memory or belief offered to prove the fact remembered or believed is included in this exception only if it relates to the execution, revocation, identification, or terms of declarant's will.

Pa.R.E. 803(3).[6]

"Generally, out[-]of[-]court statements by homicide victims are admissible when they are relevant to show proof of motive or malice." *Commonwealth v. Kunkle*, 79 A.3d 1173, 1185 (Pa. Super. 2013), *citing Commonwealth v. Luster*, 71 A.3d 1029, 1041 (Pa. Super. 2013) (*en banc*), *appeal denied*, 83 A.3d 414 (Pa. 2014). In *Luster*, the statement by

_____

[6] We note the Pennsylvania Supreme Court has promulgated new rules of evidence, which took effect on March 18, 2013.

- 11 -

a murder victim to her friends that she was afraid that appellant "was going to do something real bad to her," was introduced at trial. *Id.* at 1041. The *Luster* Court, sitting *en banc*, concluded that the statements were admissible under the state of mind exception to the hearsay rule because the appellant had denied responsibility of the murder and thus, the statements evidenced appellant's ill-will and malice toward the victim. *Id.* at 1042.[7] ***See also Kunkle, supra*** (holding admission of hearsay statements by the decedent that he was scared of appellant and that appellant would be to blame if decedent died was proper under Pa.R.E. 803(3) and *Luster*, as the statements reflected appellant's ill-will and malice toward decedent).

The *Luster* Court, while recognizing that a victim's state of mind is only admissible where the victim's state of mind is a factor at issue in the case, relied on case law holding that out-of-court statements by homicide victims are admissible when the statements are relevant for some other purpose, such as proof of motive or malice. *Id.*, 71 A.3d at 1041–1042. The majority in *Luster* found such a connection between the victim's expression of fear and the defendant's malice or motive, but the logical connection was not explained. ***See id.*** at 1041. ***See also*** Ohlbaum on the

---

[7] The author of this memorandum disagreed with the majority's view in *Luster* that the victim's statements were admissible under the state of mind exception *See Luster*, 71 A.3d at 1061 (Ott, J., concurring and dissenting).

Pennsylvania Rules of Evidence, § 803.03[13] (2014 ed.) (noting "little discussion as to the relationship between state of mind and motive" in **Kunkle** and **Luster**). However, if we are to accept as a matter of course a logical connection, then such statements would become automatically admissible. This result would effectively represent a *sub silentio* overruling of prior case law to the contrary. As such, and because the logical connection between the victim's statement of fear and the defendant's malice is not obvious instantly, we are reluctant to extend **Luster** to this case. In this regard, we note that in **Commonwealth v. Green, supra**, 76 A.3d 575 (Pa. Super. 2013), *appeal denied*, 87 A.3d 318 (Pa. 2014), the majority opinion, without citing **Luster**, held that a victim's statements to others that she was afraid of the defendant were not admissible under the state of mind exception to the hearsay rule. **Id.** at 579–582.[8] Therefore, we limit **Luster** to its case-specific holding.

However, assuming Megan Walsh's testimony concerning the victim's Facebook comments does not fit within the state of mind exception to the

---

[8] The **Green** Court ultimately concluded the admission of the hearsay testimony was harmless error. **Id.** at 582. Judge Strassburger, in his concurring opinion, disagreed with the Majority's determination that the statements were inadmissible, and noted "the Majority Opinion overlooks the plain language of Pa.R.E. 803(3), and does not consider adequately decisions by this Court and our Supreme Court that reach contrary results, including the recently-decided **Commonwealth v. Luster**[.] **Id.** at 587 (footnote omitted).

hearsay rule, our analysis does not end. Rather, we are required to apply a harmless error analysis. "An error may be deemed harmless, *inter alia*, where the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Commonwealth v. Moore*, 937 A.2d 1062, 1073 (Pa. 2007), *cert. denied*, 555 U.S. 969 (2008).

Here, the trial court, in evaluating the sufficiency of the evidence, stated:

> It is uncontested that, in shooting Walsh, Becker used a deadly weapon upon a vital part of her body. The Commonwealth provided the jury with direct and circumstantial evidence of Becker's intent to kill Walsh. The jury heard testimony in the form of police interviews in which Becker stated that he was in the process of cleaning his gun at the time of the shooting, yet he loaded the magazine of the weapon and shot Walsh from close range. … Becker stated during a police interview that the magazine was out of the weapon at the time of the shooting; however Fire Chief Troy Montgomery testified that he recovered a round from the chamber.

Trial Court Opinion, 12/26/2013, at 21.

The significance of the cartridge recovered in the chamber is that the magazine must have been in the gun for the next cartridge to have been chambered after Walsh was shot. **See** N.T., 3/6/2014, at 2104, 2241, 2262. When Becker was first interviewed in the early hours of August 13, 2011, he told police the shooting was an accident based upon his claim there was no

magazine in the gun and he believed the gun was empty.[9]  **See** N.T., 3/5/2013, at 1836, 1843; N.T., 3/6/2013, at 2102; N.T., 3/8/2013, at 2680; Commonwealth Exhibit 10 (audio CD of first interview).  However, when the gun was recovered, a live cartridge was in the chamber.  N.T., 3/4/2013, at 1685.  The fact that there was a cartridge in the chamber after the gun had been fired disproved Becker's statement to police that the magazine was not in the gun at the time of the shooting.  In light of this critical evidence, which fully supports the Commonwealth's theory that Becker knowingly pointed a loaded gun at Walsh, we conclude the admission of Megan Walsh's testimony of her sister's Facebook statements was harmless error.

_____

[9] The magazine was not in the gun when the police recovered the gun.  **See** N.T., 3/4/2013, at 1684–1685.  Police found the magazine on the bedroom floor of the room where the victim was killed.  **See** N.T., 3/5/2013, at 1978–1979. The magazine contained eight unspent rounds.  **Id.** at 1980, 1984.

In a second interview, on August 18, 2011, police told Becker the gun would not work without the magazine in it, and Becker stated that he might have put the magazine in to get the hammer to go down, and the round went off. **See** N.T., 3/7/2013, at 2439, 2445, 2482, 2535.  He indicated he did not know there was a cartridge in the chamber at the time the gun fired.  **Id.** at 2445.   **See also** N.T., 3/8/2013, at 2603.  Corporal Robert Courtright, who interviewed Becker, testified:  "There were differing testimonies on whether there was a magazine in the gun or the magazine wasn't in the gun, and he [Becker] said that there wasn't a cartridge in the chamber."  N.T., 3/8/2013, at 2603.

In sum, we find the arguments presented by Becker that challenge the Rule 404(b) evidence admitted by the trial court, with respect to Danielle and Devon Detweiler, Gregory Miller, and Megan Walsh warrant no relief.

As previously stated, with regard to the remaining issues raised by Becker in this appeal, we affirm based upon the sound reasoning of the trial court, as set forth in its opinions, dated January 11, 2013 and December 26, 2013. We instruct the parties to attach those decisions in the event of further proceedings in this matter.

Judgment of sentence affirmed.

Judge Stabile joins in this memorandum.

Judge Bowes concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/11/2015

OPINION NO. 2013-02
January 10, 2013
Copies to:
Mark Fetterman, Esquire
Dennis G. Charles, Esquire
LAW REVIEW (DO NOT PUBLISH)
Law Library
File

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CRIMINAL ACTION-LAW

COMMONWEALTH OF PENNSYLVANIA      :
                                  :
vs.                               :      No. 4681-2011
                                  :
MATTHEW BECKER                    :

## MEMORANDUM OPINION AND ORDER

On August 18, 2011 a written complaint was filed by Tpr. Chadwick S. Roberts of the Pennsylvania State Police charging the Defendant with one count of criminal homicide regarding the August 12, 2011 shooting death of Allison Marie Walsh, and one count of criminal homicide of an unborn child relating to the subsequent death of her unborn baby. A preliminary hearing was held on October 11, 2011 and the case was returned to Court. On November 28, 2011 the District Attorney filed the above numbered information charging the Defendant with criminal homicide, 18 Pa. C.S.A. 2501, and criminal homicide of an unborn child, 18 Pa. C.S.A. 2603.[1]

On May 30, 2012 the Defendant filed his Omnibus Pretrial Motion containing (1) Motion to Suppress Defendant's Statements; (2) Motion in Limine: Improper Character, Hearsay & Opinion Evidence; (3) Motion in Limine: Juvenile Arrests and Informal Probation; (4) Motion

---

[1]After the preliminary hearing but before the information was filed the Commonwealth filed its notice of intent to seek sentence of death on October 18, 2011.

to Examine and Test - Fire Weapon; (5) Motion in Limine: Alleged Crime Scene/Autopsy Photographs; (6) Motion to Order Commonwealth of Pennsylvania Forensic Expert to Prepare Report; and (7) Motion for Leave of Court to File Supplemental Omnibus Pretrial Motion Upon Receipt of Additional Discovery and/or Evidence.

On June 15, 2012 the Commonwealth filed its Notice of Intention to Introduce Evidence of Other Crimes, Wrongs or Acts Pursuant to Pennsylvania Rule of Evidence 404 (b).

A hearing was held on August 15 and 16, 2011 regarding Count I of the Omnibus Motion, Motion to Suppress Defendant's Statements. There are in fact two statements at issue. The first statement was given to Trooper Chadwick Roberts and Cpl. Robert Courtright from approximately 1:47 A.M. to 3:41 A.M. on August 13, 2011[2] at the PSP barracks in Harrisburg. This statement was audio taped. At the time the Defendant was in custody relating to a disturbance at the Hershey Medical Center. At the conclusion of the interview the Defendant was involuntarily committed pursuant to section 302 of the Mental Health Procedures Act. At the conclusion of the 120 hours the Defendant voluntarily committed himself pursuant to sections 201 and 303 but shortly thereafter he signed himself out.

After the Defendant was released the state police asked the Defendant to come to the PSP barracks at Ephrata for a further interview and the Defendant agreed to do so. He then voluntarily came on August 18, 2011. He subsequently talked to Tpr. Roberts and Cpl. Courtright for approximately four hours and this interview was audio and video recorded.

At the conclusion of this interview the Defendant was arrested for the crimes he was charged with.

---

[2]There was approximately a 45 minute break during this time period.

### Second Interview - August 18, 2011

There are two issues to be considered. The first is whether the Defendant was in custody. Both sides have discussed this in their briefs and the Court finds that the Defendant was not in custody. The first, and most important fact is that the Defendant voluntarily came to the police station. The second is that, despite assertions in the Defendant's brief, the Defendant never asked to leave or attempted to leave.

Even if the Defendant was in custody it would be irrelevant. The Defendant was in fact given his Miranda warnings.

The second issue is whether or not the Defendant invoked his Miranda rights. There are two alleged invocations. The first one which occurred at 11:28:40 as indicated by the video was "I don't know. I have noting more to say cause no matter what I say you're trying to make me seem like something I'm not." The second occurred at 12:31:53 was "Okay. I'm done now."

Niether of these allegations are unambiguous. In Berghus v. Thompkins, 130 S. Ct. 2250 (2010) the United States Supreme Court held that if a Defendant makes a statement that is ambiguous or equivocal, the police are not required to end interrogation or ask questions to clarify whether the accused wants to invoke this Miranda rights.

### First Interview - August 13-14, 2011

Neither side briefed this issues, probably because there is no issue. The Defendant was in custody for this interview and was properly given his Miranda warnings.

Consequently, the Court issues the following:

## ORDER

AND NOW this 10<sup>r</sup> day of January, 2013, the Defendant's Motion to Suppress

Statements is hereby DENIED. The statement made by the Defendant on August 13-14, and

August 18, 2011 are admissible.

I certify this document to be filed
In the Lancaster County Office of
the Clerk of the Courts.

ATTESTED:

Joshua G. Parsons
Clerk of the Courts

Copies to: Mark Fetterman, Esquire
Dennis Charles, Esquire

BY THE COURT:

JOSEPH C. MADENSPACHER
PRESIDENT JUDGE